65 So.2d 208

**TAIT v. STATE.**

**I Div. 651.**

Court of Appeals of Alabama.

March 17, 1953.

Rehearing Denied April 7, 1953.

V. R. Jansen, Mobile, for appellant.

Si Garrett, Atty. Gen., and Maury D. Smith, Asst. Atty. Gen., for the State.

**HARWOOD, Judge.**

The appellant was indicted for conspiring with Harold R. McMichael and three other named men to assault and beat Dean Durham.

His jury trial resulted in a verdict of guilty, and judgment and sentence was entered pursuant to the verdict.

The evidence below shows that during the early part of January 1950 a strike was in progress at radio station WABB in Mobile. The assaulted party Dean Durham had been employed by the radio station to work during the strike as a technician at its transmission station located several miles out from Mobile.

The principal witness for the State in the trial below was Harold McMichael, usually called "Mike."

McMichael is a steel worker, but was unemployed in January 1950. He filled in this period of unemployment by serving spasmodically as a bar tender, and as a handy man at some bars and taverns in Mobile.

McMichael testified that on the night of January 3, 1950 the defendant came to his rooming house in Mobile and introduced himself as Ernest Johnson. The defendant told McMichael that he wanted him to take care of "or to beat up some boys at WABB." McMichael told defendant his charge would be "a flat one hundred dollars." The defendant told him he would let him know in a day or two.

Two days later, on a Wednesday, McMichael and the defendant met at the

Central Cafe in Mobile. On this occasion the defendant gave McMichael a piece of paper with the names of the men at the radio station, their automobile tag numbers, and a sketch showing the location of the transmission station written thereon. The defendant also paid McMichael $5 at this time. The two then rode out to the transmission station in defendant's automobile, looked at it, and returned to the Central Cafe, where they parted.

On Friday night McMichael again met the defendant. The defendant gave McMichael three twenty dollar bills and instructed him to rent a U-Drive-It car to get out to the transmission station. McMichael told him he could not rent such a car, he had tried before. The defendant then told him to drive out in his (McMichael's) car, and this McMichael refused to do. The defendant then again insisted that McMichael obtain a U-Drive-It car, and left for his place of employment at Fort Whiting. McMichael did not attempt to rent a car, but instead got a cab and went to defendant's place of work. This second meeting resulted in the defendant driving McMichael to the transmission station in the defendant's automobile.

On a side road approaching the transmission station from the rear the defendant's car became stuck in the mud and it was necessary to get a wrecker to pull it out.

At this point the defendant and McMichael were observed by Mr. William Hearin and Chief McFayden of the Mobile Police Department who approached in Hearin's car. Being unable to pass Hearin backed his car with the wrecker towing the defendant's car, his headlights being on defendant's car during this operation.

At this point, according to McMichael the defendant said he thought they ought to call the deal off, and McMichael told him he was satisfied with what money he had, and was not going to return it.

At any rate, the defendant did drive McMichael to the transmission station. McMichael said it was agreed that "after he had done the job" the defendant was to pick him up on a bridge nearby.

As to what happened when McMichael went to the transmission station we quote the following excerpt from his testimony:

"Q. Was the place locked up or was it open, how did you get to talk to Mr. Durham? A. Why I knocked on the screen and he didn't come to the door, he was fooling with something, kind of trinkets in there about radio stations, and I pulled the door open and shook it—

"Q. Shook it? A. And he come to the door and I asked him if his name was Durham—

"Q. What did he say to you? A. And he said yes.

"Q. Huh? A. I told you yes, when he said yes that meant his name was Durham.

"Q. What did you do or say then? A. I told him you are the fellow I am looking for and I hit him two or three times and he ran outdoors—

"Q. Where did you hit him? A. Oh! he jerked loose and I tore his shirt loose, buttons off.

"Q. He run out, did he? A. Yes sir, he did, and run around the place three or four times.

"Q. Did you catch him? A. Yes, sir, I caught him.

"Q. How did you catch him, Mike? A. I tackled him."

When McMichael returned to the highway after the assault the defendant drove away when McMichael was yet 100 feet away from defendant's automobile. McMichael was shortly thereafter apprehended by officers as he was running down the road.

When arrested McMichael turned over to the officers the paper containing the names, etc., and the money that the defendant had given him.

Partly on direct examination and partly on cross examination McMichael further testified that he did not intend to hurt the men at the transmission station, and that he had talked to a member of the sheriff's force after the defendant had contacted him, but had been told that "there was nothing to it," but to go along with the man. McMichael further testified that if he were shadowed by officers during this time he did not know it.

Dean Durham, Chief McFayden, Deputy Sheriff Herman Blake and Mr. Hearin, before mentioned, also testified as witnesses for the State. Their testimony tends to corroborate in many phases the testimony given by McMichael, and no useful purpose would be served delineating in detail this portion of the State's evidence.

The defendant was arrested at his place of employment when he returned there from the transmission station.

Upon being taken to the sheriff's office he made a statement which was typed by one of the officers. The statement was read back to the defendant, who followed the reading on a copy given him. He then signed the statement.

After proper predicate was laid as to its voluntary character this statement was received in evidence over appellant's objection.

The statement is entirely confessory and is substantially in accord with the version of the affair as testified to by McMichael.

In his own behalf the appellant testified that when he first contacted McMichael he did so for the purpose of getting Mc-Michael merely to talk to the two men working at the transmission station; that he believed McMichael's appearance was such that the men would quit their jobs after he had interviewed them. At no time did he intend to have McMichael beat the men up, nor did he instruct him to do so.

The defendant testified that he did go to McMichael's rooming house when he first contacted him, and that he did give Mc-Michael a slip of paper with the names of the men working at the transmission station and a sketch of its location on it. He denied however that he had introduced himself to McMichael under any name other than his own.

The defendant also contended that that part of the written statement he signed wherein it said that he had been given the name of a man who would take care of the job of beating up the engineers at WABB was untrue. The defendant admitted however that after the statement had been written up he was given a copy which he read as the original was read over to him, and that he thereupon signed the statement.

The defendant also introduced several character witnesses who testified as to defendant's good reputation.

By Section 101, Title 14, Code of Alabama 1940, it is made an offense for any two or more persons to conspire together to commit a misdemeanor.

■ Since earliest times it has been well settled that the gist of conspiracy is an unlawful confederacy to do an unlawful act, or a lawful act for an unlawful purpose, and the offense is complete when the confederacy is made. State v. Cawood, 2 Stew. 360.

■ The community of purpose between conspirators need not be proved by positive testimony, as was done in this case, but its existence and intent are to be determined by the jury from the conduct of the parties and the evidence. Jones v. State, 174 Ala. 53, 57 So. 31; Cleveland v. State, 20 Ala.App. 426, 103 So. 707.

■ Further, it is not a fatal variance of which the defendant can complain on the ground of insufficiency of evidence that a conspiracy in which he participated did not contain as many persons as the indictment alleged. Neely v. United States, 5 Cir., 145 F.2d 828.

■ The State's evidence in this case, if believed by the jury under the required rule, was ample in its tendencies to sup-

port the verdict rendered. No error therefore resulted from the court's refusal of defendant's requested written charges (Nos. 1 and 2) which were affirmative in nature.

■ We find no merit in the contention of appellant's counsel that the defendant's confession was improperly admitted into evidence.

■ The predicate laid by the State was in all respects sufficient prima facie to show its voluntary character. In fact, the testimony of the appellant himself does not seriously question this condition. The questioning of a suspect while in custody of police officers is not prohibited by either the common law or by the Fourteenth Amendment of the U. S. Constitution. Nor is the confession rendered inadmissible by virtue of the fact that the officers to whom the confession was made were armed. Fitzhugh v. State, 35 Ala.App. 18, 43 So. 2d 831, and cases therein cited.

The assault and battery upon Dean, and even the defendant's participation as a confederate therein, was established by direct and positive evidence presented by the State prior to the introduction of the confession. We find no merit in appellant's insistence that the confession was received in evidence prior to establishing the corpus delicti. As we interpret appellant's brief the basis of his insistence that the corpus delicti had not been established was McMichael's testimony to the effect that he had talked to some members of the sheriff's force after the defendant had contacted him, and his further statement that he did not intend to hurt the men at the radio station.

We cannot see that the fact that McMichael contacted a member of the sheriff's force can affect the existence of the corpus delicti. His testimony along this line was vague, and as to what he told this officer is represented by the following excerpt from McMichael's testimony:

"Well, he didn't know nothing, no grounds to work on; I was telling him this and telling him that, I didn't

know whether to tell him about Ed Tait or what."

While McMichael testified that he did not intend to "hurt" the men at the radio station, this statement must be measured in light of the fact that McMichael did commit an assault and battery on Dean, and apparently intended to do so. Further, light is cast on McMichael's meaning of "hurt" by his testimony to the effect that he was not worried by the fact that more than one man would probably be at the transmission station, that he could whip five men, and could have killed Dean had he wanted to.

Nor can any significance be attached to the defendant's professed desire to withdraw from the whole thing. The evidence clearly shows that his reluctance in this regard sprang from alarm that he and McMichael had been observed rather than from any change of conscience. Even so, the defendant's thoughts of withdrawal were not activated, as under the undisputed evidence he thereafter drove McMichael to the scene of the assault and waited awhile to pick him up after he had accomplished his purpose.

■ During the cross examination of State's witness Dean Durham, the assaulted party, the court sustained the State's objections to questions seeking testimony as to whether he had been "called on the telephone by the International Union from New Orleans" by people who knew him and urged to leave his employment at WABB; and whether friends in Mobile did not ask him to discontinue such employment.

Clearly these questions sought evidence immaterial to the issues of this case, and the objections were properly sustained.

■ The court also sustained the State's objection to a question propounded to Dean on cross examination if he did not come to Mobile from Texas. While the probative value of the evidence sought is remote, in so far as the issues of this case are concerned, it would appear that under the

broad scope allowed in cross examination the objection should have been overruled. We are clear however that it could not be rationally concluded that there is any real probability that the appellant was injured in his substantial rights by the ruling in this instance, and a reversal of this cause could not reasonably be posited on this ruling.  Supreme Court Rule 45.

The court also sustained the State's objection to the following question addressed to Dean on his cross examination:

"Q.  I will ask you this direct question then:  do you move around on struck radio stations seeking employment?"

The objection to this question was properly sustained.  Assuming, as the question implies, that Dean was a strikebreaker, such status in nowise removed him from the protection of our laws, nor in anywise justified a conspiracy to injure him.

Defendant's requested charges 3, 8, and 9 were adequately covered by the court's oral charge, or by other written charges given at his request.  No error therefore resulted from the refusal of these charges.

Charge 6 was properly refused since the charge is confusing, argumentative, and apparently elliptical.

Charge 10 sought to inform the jury, in the event of a verdict of guilty, that the imposition of a fine by the jury would not affect the right of the court to impose a sentence of hard labor without the consent of the jury.

This charge was properly refused.  The power of the court to impose a sentence in addition to a fine assessed by a jury is authorized by our statutes.  Section 328, Title 15, Code of Alabama 1940.  The exercise of the authority is vested in the discretion of the court, and is not a matter of concern to the jury.

Affirmed.