225 So.2d 829

### In the Matter of Jack W. Smith.

### Jack W. SMITH

### v.

### BOARD OF COMMISSIONERS OF the ALABAMA STATE BAR.

4 Div. 198.

Supreme Court of Alabama.

July 10, 1969.

J. Hubert Farmer, Dothan, and S. Fleet-wood Carnley, Elba, for petitioner.

Jack W. Smith, pro se.

422

William H. Morrow, Jr., Montgomery, for Alabama State Bar, respondent.

PER CURIAM.

This is a review of disciplinary proceedings instituted by the Grievance Committee of the Alabama State Bar against Jack W. Smith, a duly licensed attorney at law in this state.

The hearing conducted before the Board of Commissioners of the Alabama State Bar resulted in a resolution of guilty, and of disbarment.

The complaint filed by the Grievance Committee contained four charges.

Charge 1 in essence charges Smith with a violation of Section A, Rule 25(a)(b) (c) of the Amended Rules governing the conduct of attorneys in Alabama. The charge alleges that within three years prior to the filing of the complaint (20 November 1963) Smith had served as attorney for parties in more than 1000 divorce proceedings in the Inferior Court of Geneva County, Alabama; that he had knowledge or reasonable cause to believe that the parties in many of these cases were not bona fide residents of Alabama, and falsely represented facts to the Inferior Court of Geneva County in order to induce favorable action thereon by the court.

Section A, Rule 25(a)(b) and (c) is set forth verbatim in Charge 1 and is as follows:

"No person heretofore or hereafter admitted to practice law in Alabama shall

(a) Knowingly or wilfully make any false representations of fact to any judge, court or jury to induce a favorable action or ruling by either;

(b) File or prosecute or aid in the filing or prosecution of any suit, cross bill, or proceeding seeking a divorce in a court in Alabama as attorney or solicitor for a complainant or cross complainant therein or serve as referring or forwarding attorney for such complainant or cross complainant with knowledge or reasonable cause to believe that neither party to such suit, cross bill or proceeding is at the time of the filing of the bill of complaint therein, a bona fide resident of the State of Alabama;

(c) While acting as attorney for either party in any suit for divorce in any Court in Alabama represent to the Court or conspire with any party, attorney, or person to represent to the Court that either party to such suit is a bona fide resident of Alabama, knowing such representation to be false."

Charge 2 also alleges a violation of Rule 25, supra, but goes further and sets forth a conspiracy to violate the rule. In this connection Charge 2 alleges that beginning with the month of August 1962, to the date of the filing of the complaint, Jack W. Smith, Edward C. Boswell, his partner, Ned Moore, an attorney of Opp, Alabama, and Ramsey Neil Metcalf, an attorney of Geneva, Alabama, conspired for the purpose of preventing true and accurate records to be kept relating to divorce cases filed in the Inferior Court of Geneva County, Alabama by said attorneys in a manner intended to conceal the participation of Smith in numerous divorce cases filed in said court by Smith while acting as attorney for the parties.

The charge further avers that the above named attorneys, who were then engaged in handling a great number of divorce cases in the Inferior Court of Geneva County, in excess of two hundred cases per month, acting in conspiracy with W. R. Draughan, Clerk and Register of said court, and Comer

Grantham, Deputy Clerk of said court, set up a system of docketing said cases wherein the cases filed by said attorneys would be kept under a separate docket numbered B, C, and D, and all other cases to be kept in a separate docket lettered A.

That in furtherance of said conspiracy, and to conceal the name of Jack W. Smith on the records of the court in such divorce proceedings, many of the pleadings and docket entries failed to show the name of the attorney appearing for any party in divorce proceedings, and,

In furtherance of said conspiracy the records kept in the office of the Clerk and Register of said court were secreted from the public and kept in an index system in separate docket books and held under lock and key in a storage room on the second floor of the courthouse continuously from 1 September 1962 to 1 October 1963.

Admittedly, Charge 2 is ineptly drawn in that while it purportedly charges a violation of Rule 25A it goes further and sets up a conspiracy to violate such rule. The conspiracy set up in detail being a confederation between four attorneys, including the petitioner, and the Clerk and Register, and the Deputy Clerk and Register of the Inferior Court of Geneva County to set up a docketing system in such manner as to prevent the disclosure of the vast number of divorce cases being processed in the Inferior Court of Geneva County. It is significant that this secret docketing system was set up shortly after the visit to Geneva of the Proctor of the State Bar.

█ In a conspiracy case, in determining the sufficiency of the indictment, the court will look to the four corners of the indictment and not to a particular paragraph. The facts alleged and not the statute mentioned by the pleader determines what statute is violated. See 15A C.J.S. Conspiracy p. 843.

█ Charge 2 sufficiently charged a conspiracy to do a wrongful act and adequately informed the petitioner as to the wrongful

conspiracy into which he had entered and the overt acts incident thereto. As stated in In re McKay, 280 Ala. 174, 191 So.2d 1:

"The question for determination in disbarment or disciplinary cases is the fundamental one of whether an attorney who is charged with professional dereliction should be permitted to continue in his office. Basically, the proceeding is an inquiry into the conduct of an attorney to determine whether action should be taken by a court to protect the public or the dignity of the court. See Thornton on Attorneys at Law, Vol. 2, Sec. 865, and 7 Am.Jur.2d Attorneys at Law, Sec. 60.

"An attorney must be accorded due process in disbarment and disciplinary proceedings, and the requirements of due process are met when the attorney is served with charges or specifications reasonably informing him of the charges against him and the attorney is thereafter accorded a hearing with an opportunity to defend. See Am.Jur., supra, Sec. 64.

"The above requirements of due process being met, formal and technical pleadings are not essential, nor do they have any place in a disbarment proceeding. In Re Fite, 228 Ala. 4, 152 So. 246; McCord v. State, 220 Ala. 466, 126 So. 873; Ex parte Thompson, 228 Ala. 113, 152 So. 229, 107 A.L.R. 671; Ex parte Grace, 244 Ala. 267, 13 So.2d 178."

As further stated in McCord v. State, 220 Ala. 466, 126 So. 873:

"Formal and technical pleading is not essential to this proceeding." (Disbarment proceeding.)

Charge 3 charges Smith with violation of Section A, Rule 16 pertaining to an attorney introducing, or offering to introduce, testimony which he knows to be false. This charge also adopts the averments of Charge 2 relative to the conspiracy averments.

Charge 4 avers a violation of Section A, Rule 36, which provides that no person li-

censed to practice law in Alabama shall be guilty of any conduct unbecoming an attorney. The charge adopts the averments of Charge 2 relative to the conspiracy averments.

On 16 July 1962, James W. Aird, then Proctor of the Alabama State Bar, upon instructions of the then President of the Alabama State Bar, went to Geneva to investigate reports of the large number of divorce cases being processed in the Inferior Court of Geneva County.

Mr. Aird had with him a report of the Bureau of Vital Statistics as to the number of divorces that had been processed through the Inferior Court of Geneva County for the period 1 December 1961 through 31 May 1962. He went to the office of the Clerk of the Inferior Court and interviewed Mr. Draughan, the Clerk and Register. Mr. Draughan had just completed his report for the month of June 1962, and this showed that 394 divorces had been processed that month. Mr. Draughan stated that all of the divorces had been handled by four lawyers, Mr. Metcalf, Mr. Moore, Mr. Boswell, and Mr. Smith.

Mr. Aird interviewed Mr. Metcalf and explained to him the provisions and effect of Rule 25. He then proceeded to the office of Boswell and Smith where he conferred with Mr. Boswell. Mr. Boswell stated he knew what Mr. Aird was in Geneva for, and he was familiar with Rule 25. He did not think other lawyers had a right to tell him how to handle his practice, "* * * and when a client comes to my office and sits down and talks divorce to me, and they tell me they are residents of Alabama, or I have information from any other source that they are residents of Alabama, and they have grounds for divorce, I'm going to get that divorce for them."

Mr. Aird then stated he would like to talk to Mr. Smith, but assumed Mr. Boswell was speaking for Smith, and Mr. Boswell replied, "Yes."

Separate investigation visits to Geneva were also made by Mr. B. M. Waller and by Mr. R. E. Steiner III, accompanied by Mr. Euel Screws. Following these visits, made in behalf of the Grievance Committee, charges were preferred by the Grievance Committee of the Alabama State Bar against Mr. Smith, Mr. Boswell, Mr. Moore, Mr. Metcalf, and Judge Black. The charges against the four attorneys were all of substantially the same import; those against Judge Black charged him with conspiring with the four above named attorneys in processing the divorces through the Inferior Court of Geneva County.

On 25 March 1964, Hon. J. Edward Thornton, then President of the Alabama State Bar, issued a call for a special meeting of the Board of Commissioners of the Alabama State Bar to be held at 9:30 A.M., on 20 April 1964, in the Geneva County Courthouse.

The stated purposes of the meeting were, (1) to settle the pleadings, (2) hear testimony orally, and (3) to reach a final determination and take final action in the matter of George A. Black, Ramsey Neil Metcalf, Ned Moore, Jack W. Smith, and Edward C. Boswell, all attorneys at law in this state. This notice was timely served on all parties involved.

Upon roll call of commissioners at the time and place set, 22 commissioners and President Thornton were present before proceedings were begun. By unanimous vote of the commissioners, it was resolved that the President should rule on all procedural matters with right of appeal from such ruling.

We think it will simplify this review to observe at this point that the motion of Mr. Ned Moore to remove the hearing of the charges against him to Covington County, his county of residence, was granted. Likewise, in the early part of the hearing, just after Mr. Aird had testified, Judge Black and Mr. Metcalf respectively changed their pleas of not guilty to pleas of guilty. Thus the hearing proceeded only on the charges against Mr. Boswell and Mr. Smith. The

respective charges against these two were of identical import.

On 18 December 1963, this petitioner filed a plea in abatement and demanded a jury trial. In settling the pleadings at the hearing before the Board of Commissioners in Geneva, this plea was overruled and a jury trial denied. The charges were then separately amended by adding as a part of each charge a list of "the names of divorce proceedings handled by him as Attorney, which, among others, illustrate the matters and things averred herein." The list added to the charges against Mr. Smith contained some 203 cases.

A demurrer to the charges as amended was filed and overruled, and the hearing got underway.

The Board of Commissioners having jurisdiction of the disciplinary proceedings, and the parties being properly before the Board, the plea in abatement was properly overruled.

Likewise, the charges reasonably informed the petitioner of the charges against him, and the demurrers to the charges were properly overruled. In re McKay, 280 Ala. 174, 191 So.2d 1.

Mr. Aird's testimony has already been substantially set forth.

In October 1962, B. M. Waller, an attorney of Montgomery, went to the office of the Clerk of the Inferior Court of Geneva County to check into certain divorce records for the Grievance Committee. Draughan and Grantham were there. At that time he found no record of divorce cases identified by numbers preceded by the letters B, C, or D, but only cases with numbers preceded by the letter A. Draughan and Grantham advised him that the records in the office reflected all the divorce cases processed in the Inferior Court. A second visit to the Clerk's office was made by Waller in November 1962, in an effort to locate the file in a particular case. This file could not be located. Subsequently it was forwarded to Waller along with a second file. The first file number was preceded by the letter C, and the second file number by the letter B. Smith was solicitor for the complainant in this second case.

Mr. R. E. Steiner III, Chairman, and Mr. Euel Screws, a member of the Grievance Committee, went to Geneva in September 1963, to further check the divorce records in the office of the Clerk of the Inferior Court. Their testimony is to the effect that Mr. Draughan told them he was not too familiar with the records, which were largely kept by his deputy clerk, Mr. Grantham. With Mr. Grantham, they began an examination of the records in the clerk's office. Only cases bearing numbers with the A prefix were found with two exceptions. These two exceptions bore the letter prefixes of B and C. Grantham said this was a clerical error. In the front office were filing cabinets containing the divorce files commencing October 23rd or 24th 1961 through 31 July 1962. Grantham stated they had run out of numbers, and beginning 1 August 1962, a new system of docketing cases had been inaugurated. Since that time the letter A had been used, and the numbers began with No. 11. Mr. Grantham showed them a large book bound in red leather which was the docket book. This docket book, and a minute book No. 11 contained only A cases.

Toward lunch time Steiner and Screws came across a cash book containing receipts for costs paid in a large number of divorce cases. None of these cases were shown in the various record books in the office. These receipts bore letter prefixes B, C, and D. They demanded of Grantham that he produce these files, and the files in the cases bearing the letter prefixes of B, C, and D. Grantham denied there were any such files, and snatched the cash receipt book from Steiner's hands.

Steiner and Screws left the clerk's office for lunch. Returning to the courthouse after lunch they found it apparently empty. By phone they attempted to contact Draughan, Grantham, Judge Black, Metcalf, Boswell, and Smith, but were un-

successful. They decided to wait in the courthouse. After a considerable period of time Grantham returned. All of the cash receipt books had disappeared from the office. Steiner and Screws again demanded of Grantham the cash receipt books. At first he denied there were any, and being told they had been seen, Grantham stated he would "not answer as to the books."

Returning to Montgomery, Steiner with approval of the Grievance Committee, procured the issuance of subpoenas duces tecum commanding Judge Black, Draughan, and Grantham to appear before the Grievance Committee in the courthouse of Geneva County at 10:00 o'clock A.M. on 1 October 1963, there to speak the truth and to produce all records pertaining to divorces processed in the Inferior Court of Geneva County from 23 October 1961 to the date of the receipt of the subpoena.

Subpoenas duces tecum were also served upon the four attorneys seeking production of all their files relative to divorce cases handled by them in the Inferior Court during the period above mentioned.

When the Grievance Committee met in Geneva at the appointed time, the four attorneys respectfully refused to produce their files for reasons not necessary to set forth.

At the behest of certain county officials an alternate writ of prohibition had been issued by the Circuit Court and at this time was served upon the members of the Grievance Committee. Apparently there was disagreement between the various attorneys as to the scope of the writ of prohibition which had been granted. The petition for the writ had been prepared by Mr. Boswell, and Smith was familiar with it.

Members of the Grievance Committee immediately drove to Ozark, filed an answer to the petition for the writ of prohibition, and the Circuit Court dissolved and set aside the alternative writ. The Grievance Committee returned to Geneva and their

investigation resumed. At this stage Mr. Draughan announced his willingness to cooperate with the committee and to produce all records of the Inferior Court pertaining to divorces processed therein. The secret dockets were thus brought to light.

The tendency of the evidence presented to the Commissioners is that very shortly after Mr. Aird's visit to Geneva a new method of docketing cases in the Inferior Court was set up. Mr. Draughan testified he went to the offices of Metcalf and Boswell and Smith and he thinks, Moore was informed by telephone. Boswell and Smith were assigned the letter B, Metcalf the letter C, and Moore the letter D. Thereafter the respective attorneys would place the docket number on the papers themselves, preceded by their designated letter. If no letter preceded the number, the case was placed on the A docket, which was kept in the clerk's office.

Mr. Steiner testified that he had talked with Mr. Draughan relative to the setting up of the B, C, and D dockets, and Mr. Draughan had told him that shortly after Mr. Aird's visit he had conferred first with Mr. Boswell, and later with Mr. Metcalf and Judge Black and perhaps with Mr. Moore, either in Mr. Boswell's office or by telephone and it was concluded that "they" would go into the A, B, C, and D docket system. Any case filed by an attorney in the state of Alabama would go into the A docket, as would any case filed by Boswell, Smith, Metcalf, or Moore, if they requested such case to be placed in the A docket.

The B, C, and D cases were recorded on loose leaf docket sheets and never placed in the A docket book kept in the clerk's office. When a few of these sheets had accumulated, they were taken to an upstairs locked room. Minute book 11 was maintained in the clerk's office. Minute books 12, 13, 14, and 15, in which the B, C, and D cases were recorded were kept in the upstairs room. All of the B, C, and D cases were waiver and answer cases.

During the period between 23 October 1961 through 31 July 1962, some 3,080 divorce decrees were granted by the Inferior Court. From 1 August 1962 to 19 September 1963, there were 2,740 such decrees issued. Of these, 650 were B (Boswell and Smith) cases. After the new docket system was set up only those divorce decrees docketed in the A docket were reported to the Bureau of Vital Statistics, despite the provisions of Section 93, Title 22, Code of Alabama 1940. For August 1962, two divorce cases were reported to the Bureau of Vital Statistics, and in September 1962, twenty-four. Some 2,650 divorce cases disclosed by the B, C, and D cases were not so reported.

It was stipulated by all the parties that where the receipt for costs found in the cash receipt books bore the prefix "B" such receipts were given in divorce cases handled by Boswell and Smith whether or not the name of any attorney appeared on the papers.

A majority of the divorce cases processed by Boswell and Smith were sent by forwarding attorneys who would inclose a complaint, power of attorney, affidavit of residence, answer and waiver, and testimony (we presume by deposition), that is, all essential papers for obtaining an uncontested divorce, other than a note of testimony. Some few of the cases were filed pro se, and Boswell and Smith did not require a power of attorney where there was an answer and waiver.

■■■■ When by prearrangement or on the spur of the moment two or more persons enter into a common enterprise and a criminal offense or an unlawful purpose is contemplated, then each is a conspirator, and if the unlawful act is carried out, each is guilty of the offense contemplated. Such confederation or conspiracy need not be proved by positive testimony. It seldom can be. The trier of fact is to determine its existence and extent from all the evidence in the case and the conduct of the parties. Stokley v. State, 254 Ala. 534, 49 So.2d 284; Skumro v. State, 234 Ala. 4, 170

So. 776; Tait v. State, 37 Ala.App. 130, 65 So.2d 208.

As stated in 16 Am.Jur.2d Conspiracy, Section 38:

"Declarations and acts of one conspirator pursuant to or in furtherance of the conspiratorial purpose are admissible in evidence against any other member of the conspiracy if there is at least prima facie proof of the conspiracy alleged by the prosecution. * * *

* * * * * *

"Ordinarily declarations or acts of a co-conspirator should not be introduced in evidence against another member of the conspiracy prior to prima facie proof of the existence of a conspiracy, but if the evidence in its entirety establishes the existence of a conspiracy, the order in which declarations or acts of a co-conspirator are introduced in evidence loses its significance."

We see no need to recapitulate the evidence introduced by the Grievance Committee to establish the conspiracy alleged in Charge 2, or the misconduct alleged in Charge 4. A mere reading of the evidence as above delineated demonstrates the ample and compelling sufficiency of the evidence to sustain conclusions of the Board of Commissioners that this petitioner, together with his co-conspirators named in the charges, conspired together to commit an unlawful act by having a public officer fail to keep books and records as required by law (see Section 204, Title 41, Code of Alabama 1940), and to keep records in a nature or character as to render it impracticable to ascertain the business affairs of such officer without resort to extraneous evidence. (See Section 205, Title 41, Code of Alabama 1940.)

Charge 1, in essence, charges the petitioner with serving as an attorney in more than 1,000 divorce cases processed in the Inferior Court of Geneva County, and that in serving as such attorney he had knowledge, or reasonable cause to believe,

that neither party to the divorce proceedings was at the time a bona fide resident of Alabama. By amendment a list of some 203 such cases was made a part of the complaint as illustrative of the matters alleged.

To establish this charge the Grievance Committee introduced in evidence the files in several cases listed in the amendment to Charge 1. These files reveal that Mr. Smith was the attorney for the complainant in these cases, all of which were waiver and answer cases. These files further reveal that these respective waivers and answers signed by the respondents were acknowledged before United States Consuls in various parts of the world, such as France, Saudi Arabia, Jugoslavia, and Argentina. Such evidence only shows where the respondents were at the time they executed the respective waivers and answers. While such evidence, together with the large number of divorce cases participated in by Mr. Smith, may raise a smoke cloud of suspicion as to the real domicile of the complainants, the adage that, "Where there is smoke there must be fire," cannot be used to supply evidence otherwise lacking. We do not find evidence in the record tending to show where these complainants were domiciled. The burden was upon the Grievance Committee to present evidence tending to show that the complainants were not domiciled in Alabama at the time of the filing of the complaints. Such evidence not being disclosed in this record, we must perforce disapprove of the finding of guilty of Charge 1.

The same deficiency of evidence also compels our disapproval of the finding of guilty of Charge 3.

Petitioner has asserted a number of other points which he contends infect these proceedings with error. We find these contentions without substance.

Petitioner contends, as we interpret counsel's brief and argument, that because the circuit courts of this state also have jurisdiction to disbar attorneys, and such judges must take the oath of office prescribed by Section 279, Article 16, of our Constitution, ergo, the members of the Board of Bar Commissioners sitting in disbarment proceedings must also take such oath, and absent such oath their actions are void.

The methods and procedure in removal or suspension of attorneys from the practice of law are commulative. Section 28, Title 46, Code of Alabama 1940. The Board of Commissioners are not State officers within the constitutional sense. Section 279 therefore has no application. Ex parte Huie, 278 Ala. 330, 178 So.2d 156; Ex parte Griffith, 278 Ala. 344, 178 So.2d 169.

Petitioner asserts that the action of the Board in adopting the motion to the effect that the President of the Bar should rule on all procedural matters with the right of appeal from any such ruling, was an unlawful delegation of the judicial powers of each member of the Board to the President. Counsel for petitioner asserts in brief:

"The President of the Alabama Bar Association is not a member of the (Board of) Commissioners of the Alabama State Bar." (Par. ours.)

Such statement overlooks the provisions of Section 24, Title 46, Code of Alabama 1940, wherein it is provided that the President of the State Bar shall serve ex officio as President of the Board of Commissioners, and shall preside at all meetings of the Board.

Counsel argues that designating the President to make the rulings as above mentioned was an attempt by the members of the Board to wrongfully shift their individual responsibility and was an act of expediency—that every objection, motion, etc., should have been discussed pro and con by the members of the Board and a vote then taken as to the ruling. Counsel admits this procedure would have been

time, consuming. With over twenty lawyers on the Board, this admission can be characterized as a monumental understatement of the situation. We know of no multimembered board, commission, or appellate court that does not, for the sake of orderly procedure, have a designated member function in the role of presiding officer. Practicality demands such an arrangement. We also note that while the adopted procedure provided for an appeal from any ruling by the President, no appeal was made to the Board as to any ruling either by the parties or by any member of the Board.

Counsel further argues that petitioner's rights to due process of law were violated in several instances.

First, that he was entitled to a jury trial.

■■ Since Ex parte Thompson, 228 Ala. 113, 152 So. 229, 107 A.L.R. 671, it has been firmly established that there is no right to a jury trial in disciplinary proceedings. This doctrine has been reaffirmed in In re Fite, 228 Ala. 4, 152 So. 246; Ex parte Messer, 228 Ala. 16, 152 So. 244; Ex parte Walker, 228 Ala. 130, 152 So. 246; Ex parte Denson, 235 Ala. 313, 178 So. 434; Ex parte Cooke, 263 Ala. 481, 83 So.2d 195; In re McKay, 280 Ala. 174, 191 So. 2d 1.

Second, petitioner asserts error in the action of the Commissioners in considering his case immediately upon completion of the hearing without first having a transcript of the proceedings prepared.

The basis of this contention is that Rule 16B governing the conduct of attorneys provides that when evidence is taken by the Grievance Committee, a commissioner, or by the Board of Commissioners, it shall be taken down in shorthand, transcribed, and the transcript filed in the office of the Bar secretary.

Rules 19B and 20B relate to the summonsing of witnesses, the forms provided, and payment of witnesses. Rule 21B, under the heading "Hearing: Executive Session" provides among other things:

"The Board shall, at any regular, adjourned, or special meeting, *thereafter,* consider the evidence, in open meeting or with the consent of the accused in executive session as may be determined by the Board. After thus considering the evidence and hearing the parties in interest, the Board shall * * * reach its decision." (Emphasis ours.)

Petitioner's counsel by conjoining Rule 16B and Rule 21B, would have us interpret the word "thereafter" appearing in Rule 21 as requiring the Board, even though it has conducted the hearing, to postpone consideration of the evidence until a transcript of the proceedings was filed in the office of the Secretary of the Bar.

It is readily apparent that the purpose of Rule 16B is to provide a record which this court may review, and to provide a record for the Board's consideration if the hearing was before the Grievance Committee or a commissioner appointed to take evidence. A record of the proceedings was filed with the Secretary.

■■ Rule 21B is independent of Rule 16B, and relates to consideration of the evidence by the Board. If the evidence has been adduced before a grievance committee or before a commissioner appointed to take evidence in the matter, the consideration of the evidence by the Board would have to be after the evidence was reduced to a transcribed record. But, where as here, the Board itself conducted the hearing, it would torture common sense to conclude that the members of the Board could not consider the evidence while it was fresh in their minds, but must await the filing of the record of the evidence in the office of the Secretary of the Bar. Nothing in Rules 16B, or 21B can be rationally decreed to require such procedure.

As stated in Ex parte Newton, 265 Ala. 650, 93 So.2d 164:

"In reviewing disbarment proceedings before the Board of Commissioners, this Court possesses inherent power as well as specific statutory authority to take such action as is agreeable to our judgment; and we may adopt the findings and conclusions of the Commissioners or may alter or modify them." (Numerous citations omitted.)

Pursuant to this authority, it is our conclusion that the resolution of guilty as to Charges 1 and 3 should be disapproved because, in the posture of the record as presented, the evidence is insufficient to support the resolution of guilty as to these two charges.

It is our opinion that the evidence is ample, and in fact compelling, as supportive of Charges 2 and 4. The resolution of guilty and of disbarment is therefore due to be approved and affirmed.

Affirmed.

All the Justices concur, except COLEMAN, J., not sitting.