# Richmond

LARRY WAYNE WOOD v. COMMONWEALTH OF VIRGINIA.

June 11, 1973.

Record No. 8180.

Present, All the Justices.

*Charles M. L. Mangum* (*Henry B. Hinton, Jr.*, on brief), for plaintiff in error.

*Linwood T. Wells, Jr., Assistant Attorney General* (*Andrew P. Miller, Attorney General*, on brief), for defendant in error.

HARMAN, J., delivered the opinion of the court.

Larry Wayne Wood (Wood or defendant) was convicted by a jury at a consolidated trial on two indictments[1] charging him with "distribution" of a controlled drug in violation of Code § 54-524.101.[2]

---

[1] Indictment I charged Wood with the distribution of heroin in September, 1971, and indictment II charged him with distributing marijuana in October, 1971.

[2] Code § 54-524.101 was repealed by the 1972 General Assembly which simultaneously enacted Code § 54-524.101:1 *et seq* in lieu thereof. Acts of Assembly, 1972, C. 798.

The jury fixed his punishment at three years in the penitentiary on indictment I and at two years imprisonment on indictment II.

The only question before us is whether the evidence, viewed in the light most favorable to the Commonwealth which prevailed below, is sufficient to establish that the defendant was guilty of distribution within the meaning of that term under Code § 54-524.101.

The charges against Wood arose from his transactions with two state police officers, D. W. Pruitt and W. R. Rector, Jr., who were on undercover assignment to investigate drug activity in the Lynchburg area during the summer and fall of 1971.

Wood first met Pruitt at a party in late August or early September. At their first meeting Wood and Pruitt found that they had a common interest, drugs. After their first meeting they saw each other on several other occasions and their friendship ripened. Wood, of course, did not know that Pruitt, who cast himself in the role of a recently discharged veteran and drug user, was an undercover officer.

Pruitt introduced Wood to Rector who was occupying an apartment with Pruitt and two other undercover officers. Wood frequently visited this apartment and actually resided there with the officers for a period of ten days or two weeks in early October.

The evidence discloses that Wood initiated both of the transactions leading to his convictions. In each instance he told one of the undercover officers that he was going to purchase contraband drugs and invited the officer to join with him in making a purchase. On each occasion, in the officer's presence, Wood received a quantity of drugs from a seller and subsequently delivered part of them to the undercover officer.

The defendant argues that each of these transactions was "a joint venture by two persons to come into possession of some controlled drugs" and that Wood did not knowingly and intentionally distribute drugs as proscribed by Code § 54-524.101 (a).

The defendant would have us adopt the "procuring agent" theory or rule which has been widely followed in the federal courts since it was initiated, so far as we can ascertain, in *United States* v. *Sawyer*, 210 F.2d 169 (3rd Cir. 1954). See *United States* v. *Barcella*, 432 F.2d 570, 571 (1st Cir. 1970), for a compilation of cases dealing with this theory.

In essence the theory is that if the defendant, in procuring the drugs and delivering them to the recipient, acted solely as the agent of the recipient, and in no other capacity, then the delivery was the

transfer by an agent to his principal of what already belonged to the principal and hence did not involve a sale, barter, exchange or gift of a narcotic without a written order as proscribed by 26 U.S.C. § 4705 (a). *United States* v. *Barcella, supra.*

The procuring agent theory has been accepted by at least three of our sister states. *Commonwealth* v. *Harvard,* 253 N.E.2d 346 (Mass. 1969); *People* v. *Branch,* 13 App. Div.2d 714, 213 N.Y.S.2d 535 (1961); *Durham* v. *State,* 162 Tex. Crim. 25, 280 S.W.2d 737 (1955). *Contra, People* v. *Shannon,* 15 Ill.2d 494, 155 N.E.2d 578 (1959).

But we find those decisions adopting the procuring agent theory to be inapposite because the statutes there involved different terminology and a different statutory scheme from the terminology and statutory scheme adopted in Virginia.

This difference is strikingly pointed out in *Commonwealth* v. *Harvard, supra,* where the court noted:

". . . Rather than prosecute him as an accessory, or one who has delivered, furnished, or exchanged a drug, all of which acts are proscribed by our statutes, the Commonwealth has charged him with unlawful sale." *Id.* at 348.

Code § 54-524.2 (11) provides: " '*Distribute*' means to deliver a controlled drug." Code § 54-524.2 (8) defines deliver to mean ". . . the actual, constructive, or attempted transfer of a controlled drug, whether or not there exists an agency relationship."

Thus it can be seen that the term "distribute" as used in Code § 54-524.101 has been defined by the General Assembly so as to give it the broadest possible meaning and to proscribe acts which would not fall within the more limited terms of "sale," "barter," "gift" or "exchange" which appear in the federal and state statutes underpinning the procuring agent rule.

By the time the Drug Control Act, Code § 54-524.1 *et seq,* was enacted, Acts of Assembly, 1970, C. 650, the procuring agent rule was well defined and recognized by the courts in several jurisdictions. The conscious choice by the General Assembly of the word "distribute" and the broad definition given that word by it evinces a legislative intent to proscribe not only the illegal sale, barter, exchange or gift of controlled drugs but also any delivery or transfer, actual or constructive, of possession or title to such drugs from one person to another and we hold this proscription applies to

the delivery or transfer by an accommodation party to the transaction.

Further evidence of legislative interpretation and intent is found in the action of the General Assembly in 1972 and 1973. In 1972 the General Assembly repealed Code § 54-524.101 and, in lieu thereof, enacted Code § 54-524.101:1 *et seq*, Acts of Assembly, 1972, C. 798. The same criminal sanctions which were imposed by Code § 54-524.101 were generally retained in the amended act. The General Assembly provided, however, for a reduced penalty in those cases in which ". . . such persons gave, distributed or possessed with the intent to give or distribute such controlled substance only as an accommodation to another individual and not with the intent to profit thereby . . . ." Code § 54-524.101:1 was further amended in 1973 when the General Assembly further reduced the penalty which might be imposed upon an accomodation distributor of marijuana to not more than twelve months in jail and a fine of not more than one thousand dollars. Acts of Assembly, 1973, C. 479.

Taking this view of the statute, we find the evidence sufficient to sustain Wood's convictions.

*Affirmed.*

COCHRAN, J., dissenting.

I respectfully dissent, as I believe the evidence is insufficient as a matter of law to sustain Wood's convictions.

Wood met Pruitt at a party in late August or early September, 1971, and they developed a friendship. Through Pruitt, Wood became acquainted with Rector and two other undercover officers, all of whom shared an apartment with Pruitt. The defendant frequented the apartment and, for a period of ten days to two weeks in October, actually resided there.

There is little dispute as to the facts surrounding the two transactions which gave rise to Wood's convictions. In one instance, the defendant saw Pruitt at the Cavalier Restaurant in Lynchburg and asked if he had seen an illicit drug dealer, Greg Brown, known to both of them. Officer Pruitt indicated that he had not but suggested where Brown might be found. The defendant then asked Pruitt if he wanted to accompany him in search of Brown to buy some heroin, and Pruitt agreed. They located Brown who in turn unearthed "some dude" who was selling "nickel" or five dollar bags of heroin. As Pruitt reached for his wallet to pay for one bag, the defendant handed Brown some money with instructions to purchase two bags

for them. The defendant told Pruitt, who did not have the correct change, to reimburse him when they returned to the Cavalier. They remained in the car until Brown reappeared and delivered two foil-wrapped packets of heroin to the defendant who immediately passed one to Pruitt. After they returned to the Cavalier, Pruitt obtained change and repaid Wood.

On October 22, 1971, Wood came by the undercover officers' apartment for a visit. After he had been there about an hour, he suggested to Officer Rector that they go to the Lynchburg Community College and "score some grass". It was agreed that they would split an ounce of marijuana, and that Rector would lend Wood the latter's half of the fifteen dollar purchase price. Rector turned over the purchase money to Wood but accompanied him on the venture. When they located a source, Bill Mace, at the college, the defendant paid him and received the "baggie" of marijuana. Upon returning to Rector's apartment, Wood divided the marijuana with Rector and left.

On this evidence, Wood was convicted of two counts of unlawful distribution of a controlled drug. Relying on the broad language of the statute the majority would affirm the convictions.

In the majority opinion the "procuring agent" rule, widely followed in drug cases by the federal courts, as well as by several state courts, is rejected. In my view consideration of the rule is unnecessary in this case as the evidence fails to show that Wood made any distribution of the drugs within the meaning of the statute.

The evidence conclusively shows that the defendant engaged in two joint purchases of controlled drugs. In the course of each joint venture, during which both purchasers were present, Wood paid over the purchase money and incidentally handled his companion's share of the controlled drug. Our drug laws were not intended to be stretched so far as to punish as a "distributor" anyone who, without legal authorization, fleetingly touches a controlled drug of another. The only distribution here was made by the unidentified "dude" and by Brown, who consummated the sale of heroin, and by Mace, who sold and delivered the marijuana. Cf. *Wood* v. *Commonwealth*, 213 Va. 363, 367, 192 S.E.2d 762, 765 (1972).

Drug legislation in Virginia has recently undergone marked change. In 1970 the General Assembly replaced the Uniform Narcotic Drug Act[1] with the Drug Control Act,[2] introducing a new legislative

---

[1] Formerly Code §§ 54-487 to -519.
[2] Acts of Assembly 1970, ch. 650, now codified as Code § 54-524.1 *et seq.*

scheme. The legislature undoubtedly intended to punish the dealer severely but to show leniency toward the youthful user. *See* Bonnie & Whitebread, *The Forbidden Fruit and the Tree of Knowledge,* 57 Va. L. Rev. 971, 1158 (1970).

The provision under which Wood was convicted declared it unlawful for any person "knowingly or intentionally . . . [t]o distribute, or to possess with intent to distribute, a controlled drug . . . ." Code § 54-524.101(a)(1) (Cum. Supp. 1970). "Distribute" was then and is now defined as "deliver", which in turn is defined as "the actual, constructive, or attempted transfer of a controlled drug, whether or not there exists an agency relationship". Code §§ 54-524.2(11), (8). A "distributor" is any person who "delivers a controlled drug" or who engages "in the business of distributing, supplying, selling or otherwise disposing of drugs or medicines to any person who is not the ultimate user or consumer". *Id.* §§ (11), (32).

Read in the context of the law in 1971, it seems clear that the legislature aimed its criminal penalties for distribution primarily at unlicensed and unlawful dealers and "pushers", operating for profit. While the law was meant to punish an unauthorized seller of drugs for even an occasional sale, it was not intended to reach a mere gratuitous handler of another's purchase. This conclusion is supported by the trend of subsequent legislation which has retreated from punishing an "accommodation" seller as harshly as a seller for profit.

In 1972 Code § 54-524.101 was repealed and replaced by a provision which declared it "unlawful for any person to manufacture, *sell, give,* distribute or possess with intent to manufacture, sell, give or distribute a controlled substance". (Emphasis added.) Code § 54-524.101:1 (Cum. Supp. 1972). But the new section provided a lesser penalty for conviction if the person gave or distributed a Schedule I, II or III drug only as an accommodation to another individual and not with intent to profit thereby. *Id.* § (a).[3]

In 1973 § 54-524.101:1 was further amended to provide that a person who gave or distributed marijuana only as an accommodation to another shall be punished, at a maximum, by confinement in jail for twelve months and a fine of not more than $1,000. Acts of Assembly 1973, ch. 479.

---

[3] An accommodation seller of a Schedule I, II or III drug could be punished by imprisonment for one to ten years or, at the discretion of the judge or jury, by confinement in jail for 12 months and a fine of $1,000. An ordinary seller or distributor could be imprisoned for five to forty years and fined up to $25,000.

Two important cumulative changes may be noted since the Drug Control Act was enacted in 1970. First, the law has been broadened to include an "accommodation party" category by expanding the definition of prohibited acts to include giving or selling a drug rather than just distributing or possessing with intent to distribute. Despite the seemingly broad sweep of the language used to define "distribute", the legislature felt it necessary to add prohibitions against giving or selling. Arguably, Wood's activities in 1971, if they had occurred after the 1972 Amendment, might have been considered "accommodation" giving or selling. But we need not consider that now except as an indication that prior to 1972 there was no proscription, under "distribution", of such a joint purchase. Second, the penalties for an accommodation sale or gift have been reduced, thus clarifying the original purpose and intent of the Drug Control Act.

We have intimated before that mere presence at an unauthorized sale of a controlled drug will not justify the characterization of a user or possessor as a seller or distributor. *See Reed* v. *Commonwealth*, 213 Va. 593, 194 S.E.2d 746 (1973). Both the requisite intent and the physical conduct involved in a crime must be proven beyond a reasonable doubt. Here I conclude that neither the intent for nor the act of distribution was proven.

For these reasons I would reverse the judgment and remand the case for a new trial, if the Commonwealth be so advised.

HARRISON, J., concurs in this dissent.