Richmond

## GERALD GENE FLOYD

### v.

## COMMONWEALTH OF VIRGINIA

November 22, 1978.

Record No. 780435.

Present: All the Justices.

(Billy J. Tisinger; Harrison & Johnston, on brief), for appellant.

(Marshall Coleman, Attorney General; Robert E. Bradenham, II, Assistant Attorney General, on brief), for appellee.

Case submitted on briefs.

COCHRAN, J., delivered the opinion of the Court.

Gerald Gene Floyd was tried by a jury simultaneously upon eleven indictments charging conspiracy to commit grand larceny and eight indictments charging grand larceny. The jury, finding him guilty of seven of the conspiracy charges, and all eight of the grand larceny charges, fixed his punishment at confinement in jail for a total of twelve months and payment of fines in the aggregate amount of $3,000. Overruling Floyd's motions to set aside the verdicts as being contrary to the law and the evidence, the trial court entered judgments on the verdicts. On appeal the questions are limited to the sufficiency of the evidence, viewed, of course, in the light most favorable to the Commonwealth, and the admissibility of certain evidence.

In January, 1974, Floyd became Division Engineer for the Alexandria Division of the Southern Railway System. At that time, Robert M. Gibson was working for the Southern as Track Supervisor on the branch line running between Manassas and Harrisonburg. Under the supervision of the Division Engineer, it was Gibson's responsibility to maintain the Southern's tracks along the branch line. Gibson had a "timbering and surfacing [T & S] gang" of the Southern scheduled to retimber and resurface a portion of the track later in the year, but in accordance with general company practice, the services of an independent contractor were required to perform certain preliminary work before the T & S crew arrived. Floyd asked Gibson to recommend a contractor for this preliminary work, and Gibson reported that Benny Cooper, who operated a construction business, had expressed interest in doing contract work for the Southern. Gibson then arranged a meeting at Cooper's house in Woodstock attended by Floyd, Gibson, Cooper, and Cooper's wife, Judy, in February or March, 1974.

Gibson, who testified as a witness for the Commonwealth, said that at this meeting there was a discussion of the work to be done and the necessity for Cooper to invest money to buy equipment and employ laborers if he undertook contract work for the railway. Floyd told Cooper that he "could become a millionaire" as a railroad contractor. Gibson testified that neither he, nor Cooper,

nor Floyd worked out a scheme to defraud the railroad at that meeting, and that he did not know of any subsequent meeting where such a scheme was developed. There was uncontradicted evidence, however, that Floyd and Cooper had frequent telephone conversations, as many as seventeen in a period of two weeks. Apparently, Cooper agreed at some point to perform contract work for the Southern, as the evidence showed that he began such work in the spring of 1974.

Gibson testified that Floyd directed him to order certain tools which Cooper needed to get started. The necessary requisition was approved by Floyd, and the tools were delivered to the Southern in two shipments, paid for by the Southern, and turned over to Cooper by Gibson. There was evidence that company policy prohibited even the loaning or leasing of tools to contractors. This alleged conversion of company property was the subject of Indictments 489 and 490 charging grand larceny.

Soon after Cooper started working for the Railway, Gibson began to prepare false invoices for Cooper to submit in order to build up a "credit account" of payment for work that would be performed at a later date. According to Gibson, Floyd understood and encouraged this action. As Cooper occasionally mentioned to Gibson, none of these fictitious invoices was ever rejected by Floyd. Cooper told Gibson, "The more I make, the more you make". Approximately $30,000 had been accumulated in Cooper's account in late August, 1974, but Cooper told Gibson at that time that the credit had been paid off by work performed elsewhere.

Subsequently, Cooper submitted the low bid on a contract for work on Southern tracks in Floyd's territory near Richmond. An item of $14, 665 for ditching work was deleted, however, because of budget constraints. R. F. Cothran, Engineer of Maintenance of Way, testified that he and Floyd decided that it was necessary that the ditching be accomplished, and he directed Floyd to submit a new requisition in the sum of $14, 665 to be charged as "emergency ditching" and paid with funds from another source. The requisition, authorizing the work at the specified price, was issued to Cooper on September 27, 1974.

The evidence shows that Floyd "pre-billed" the ditching, i.e., billed as completed work ditching which had not been done, a

practice which Floyd said was generaly followed in order to have costs allocated to a current budget when funds were available, rather than to a subsequent budget. The pre-billing was accomplished through seven false invoices prepared at Floyd's direction and approved by him. Floyd also directed his clerk to prepare false back-up sheets and to sign thereon the name of L. L. Walters, the Assistant Track Supervisor in charge of the tracks in question, to substantiate that the work had been done. The false documents were given different dates to keep the amounts small, but there was evidence that they were all executed by Floyd and his clerk at one sitting. Walters testified that he was not aware of the pre-billing, that he had not authorized anyone to sign his name to the back-up sheets, and that the ditching work for which Cooper was paid had been performed not by Cooper but by two other contractors and Southern personnel.

The false invoices were as follows:

| | |
|---|---|
| October 5, 1974 | $1,312.50 |
| '' 5, 1974 | 1,400.00 |
| '' 5, 1974 | 1,575.00 |
| '' 12, 1974 | 2,625.00 |
| '' 18, 1974 | 3,850.00 |
| '' 26, 1974 | 2,677.50 |
| '' 31, 1974 | 1,225.00 |
| Total | $14,665.00 |

The seven conspiracy indictments (537-543, inclusive) under which Floyd was found guilty were based upon these seven invoices. However, the invoice of October 18, 1974, for $3,850 was the subject of Indictment 541 charging conspiracy to defraud the Southern of $3,580. The six indictments (586-591, inclusive under which Foyd was charged and found guilty of grand larceny for the payments made to Cooper for work not performed did not include an indictment for money paid under the false invoice of October 5, 1974, for $1,312.50. Indictment 589 charged grand larceny for payment of the invoice of October 18, 1974, for $3,580, rather than the correct amount of $3,850. No explanation for these discrepancies is found in the record, nor has any been suggested by counsel.

Although Gibson admitted that he received money from Cooper for assisting in the submission of the false invoices and back-up sheets, there was no direct evidence that Floyd received similar payments. However, the Commonwealth introduced circumstantial evidence to show that Floyd benefited from his association with Cooper. It was shown that Cooper's wife ordered a rug that was installed in Floyd's residence, that Cooper paid $1,548.56 for the rug, and that he had never been reimbursed in whole or in part by Floyd. It was also shown that when Floyd was transferred to Knoxville, Tennessee, he stayed overnight in Cooper's home, borrowed $10,000 in cash from Cooper, and applied this sum, pending sale of his Virginia residence, on the purchase price of a house in his new territory. There was evidence that Floyd soon repaid this loan, at Cooper's direction, to Cooper's nephew. Floyd admitted that he had in a safe deposit box $13,000 in cash which he had not declared on a financial statement because he did not consider it an asset. He took the cash to Tennessee and applied it on the purchase price of his home there. There was also evidence that Cooper followed Floyd to Knoxville and continued to do contract work for the Southern under Floyd's supervision.

Floyd argues that the evidence is insufficient to establish that he entered into any agreement to defraud the Southern. We do not agree.

There can be no conspiracy without an agreement, *see United States* v. *Perez,* 489 F.2d 51 (5th Cir. 1973), *cert. denied,* 417 U.S. 945 (1974), and the Commonwealth must prove beyond a reasonable doubt that an agreement existed. *Reed* v. *Commonwealth,* 213 Va. 593, 194 S.E.2d 746 (1973). Nevertheless, a conspiracy may be proved by circumstantial evidence. *Glasser* v. *United States,* 315 U.S. 60, 80 (1942); *Harris* v. *United States,* 283 F.2d 923, 926 (4th Cir. 1960); *Harms* v. *United States,* 272 F.2d 478, 482 (4th Cir. 1959). Indeed, from the very nature of the offense, it often may be established only by indirect and circumstantial evidence. *Madsen* v. *United States,* 165 F.2d 507, 511 (10th Cir. 1947).

In *United States* v. *Harris,* 433 F.2d 333 (4th Cir. 1970), the defendant had been convicted on a charge of conspiracy to make false bank entries. Edick, a co-conspirator and bank employee, illegally diverted credits to Harris's account and Harris withdrew

the money. Harris denied any knowledge of the illegal diversions or any agreement with Edick. However, the Court held that:

> Whether Harris's conduct constituted knowing participation in the scheme or merely inadvertence combined with incredibly careless record keeping was for the jury to decide . . . .

> It was not necessary that the Government show the existence of a formal agreement between Harris and Edick. The existence of an unlawful and inherently covert agreement can be inferred from the overt conduct of the parties. The agreement here could be inferred from Harris's acquaintanceship with Edick . . . and from his withdrawals of the proceeds of the unlawful acts. *Id.* at 335.

In *United States* v. *Godel*, 361 F.2d 21 (4th Cir.), *cert. denied*, 385 U.S. 838 (1966), the defendant likewise claimed that the evidence was insufficient to support his conspiracy conviction. Godel, a government employee, allegedly conspired with a fellow employee to appoint fiscal agents within the Department of Defense from whom Godel and his co-defendant later unlawfully borrowed government funds, which they converted to their own use. In considering Godel's appeal, the Court noted that "a common purpose and plan may be inferred from a 'development and collocation of circumstances' ". *Id.* at 23. The Court sustained Godel's conviction on the basis that the jury could have reasonably inferred from the various transactions between the parties that an illegal agreement had been formed. *Id.*

We conclude that in the present case there was sufficient circumstantial evidence from which the jury reasonably could have inferred that Floyd and Cooper were parties to an illegal agreement.

Floyd has assigned error to the ruling of the trial court admitting into evidence, over objection, statements made by Gibson and Cooper out of Floyd's presence. The general rule is that there must be evidence establishing a prima facie case of conspiracy before the declarations of a co-conspirator, made out of the

defendant's presence, may be admitted into evidence. *Glasser* v. *United States, supra; United States* v. *Kelley*, 526 F.2d 615 (8th Cir. 1975), *cert. denied*, 424 U.S. 971 (1976); Anderson v. *Commonwealth*, 215 Va. 21, 205 S.E.2d 393 (1974); Annot., 46 A.L.R.3d 1148, 1157-1158 (1972). The order of presentation of evidence, however, is usually a matter left to the discretion of the trial court and, absent an abuse of discretion, will not be disturbed by us. As the Court recognized in *Downing* v. *United States,* 348 F.2d 594 (5th Cir.) *cert., denied,* 382 U.S. 901 (1965), significant problems as to the order and sequence of proof may arise in conspiracy cases. In *Downing* the Court stated:

> Ideally, it is always more orderly to present sufficient evidence to establish the prima facie existence of the conspiracy and to identify the conspirators before presenting detailed evidence as to the substantive offenses and the acts and declarations of the conspirators . . . . As a practical matter, the proof is often "sprawling" and at certain stages of the trial may appear to present a hodgepodge of acts and statements by various persons. In the final analysis, however, it is always necessary that the evidence be connected and enmeshed so as to present a logical sequence of evidence linking the defendant with the charges against him. The very nature of such cases requires that broad discretion be vested in the trial court with respect to the order of proof. *Id.* at 600.

■ Floyd objected to the admissibility of Gibson's testimony concerning the dealings Gibson had with Cooper, and their conversations about submitting false invoices in order to receive payment for work to be performed later. But statements, otherwise inadmissible as hearsay, may be "conditionally admitted subject to being 'connected up' by subsequent independent proof of concert of action". *United States* v. *Kelley, supra,* 526 F.2d at 618. *See also Smith* v. *Board of Commissioners of Alabama State Bar,* 284 Ala. 420, 428, 225 So.2d 829, 835-836 (1969). This procedure was

followed in the present case, the trial court admitting the testimony but stating that if evidence of an agreement to defraud was not adduced the court would strike the evidence. When the record shows facts from which the existence of a conspiracy could reasonably be inferred, the case will not be reversed because proof of the conspiracy came at the wrong time. *State* v. *Thompson,* 273 Minn. 1, 17, 139 N.W.2d 490, 503, *cert. denied,* 385 U.S. 817 (1966).

As there was sufficient independent evidence of a conspiracy introduced at Floyd's trial, we hold that the trial court did not commit reversible error in admitting the testimony of Gibson as to his transactions with and on behalf of Cooper. Floyd had met with Cooper and Gibson, had discussed pre-billing with Gibson, and had approved false invoices which Gibson prepared and submitted for Cooper. Thus, there was evidence from which the jury could reasonably infer that Floyd was linked to the dealings between Gibson and Cooper.

■ There is no merit in Floyd's contention that the evidence was insufficient to support Floyd's conviction of grand larceny of the Southern tools under Indictments 489 and 490. The jury was instructed that if it believed that Floyd aided and abetted Cooper "and/or" Gibson in the larceny of the tools, of a value of more than $100, by approving the purchase requisition therefor, with intent permanently to deprive the Southern of them, it should find Floyd guilty of grand larceny. The testimony of Gibson, that Floyd initiated the conversion of the tools, if believed by the jury, was clearly sufficient to sustain Floyd's conviction of grand larceny. The jury was instructed that Gibson was an accomplice in this offense, and that Floyd could be convicted on the uncorroborated testimony of an accomplice, but that such testimony should be received with "great care". There was no objection to the form of this instruction, and the jury obviously accepted Gibson's testimony as correctly stating Floyd's participation.

■ Floyd maintains that, even if the evidence was sufficient to establish a conspiracy, it was insufficient to prove seven conspiracies; that even if the evidence was sufficient to establish grand larceny through use of the false invoices, it was insufficient to prove six offenses of grand larceny; and that, even if the evidence

was sufficient to prove grand larceny of the tools, it was insufficient to prove two offenses of grand larceny. He contends that there could only be one conspiracy to defraud the Southern, one offense of grand larceny accomplished by the use of false invoices, and one offense of grand larceny of the tools.

In support of his motion to strike the Commonwealth's evidence, offered at the conclusion of the Commonwealth's case and renewed after all evidence had been presented, Floyd argued that there was no evidence of an agreement under which he sought to defraud his employer. Overruled on his motion, Floyd never raised the point which he now asserts. Nor did he proffer an instruction to give the jury the alternative of finding him guilty of one continuing conspiracy, one continuing offense of grand larceny as to the six false invoices, and one continuing offense of grand larceny as to the conversion of the Southern tools. Furthermore, Floyd made no objection to instructions which allowed the jury to convict him upon the multiple indictments, other than to state a general objection to the sufficiency of the evidence. And the sole ground assigned, without amplification, by Floyd in his motion to set aside the verdicts was that they were contrary to the law and the evidence. Floyd now asks for a new trial on the ground that the evidence was insufficient to support multiple convictions even if it was sufficient to support convictions for continuing offenses.

In view of the relatively light punishments imposed upon Floyd's multiple convictions, his decision to rely upon an objection to the sufficiency of the evidence, if a matter of trial tactics, cannot be viewed as unwise or unsuccessful. However, he will not be permitted to raise the issues of unitary rather than multiple offenses for the first time before us. Rule 5:21. A general objection to the sufficiency of the evidence should state with some specificity the grounds of the objection. *See generally, Pauley* v. *Commonwealth,* 151 Va. 510, 144 S.E. 361 (1928); *Varner* v. *White,* 149 Va. 177, 140 S.E. 128 (1927). A general sufficiency objection does not, by itself, raise the issue whether a defendant was properly convicted of one or multiple crimes. To hold otherwise would be to deny the trial court the opportunity to consider and weigh, and, if necessary, reconsider before finally ruling on legal questions in the orderly course of trial. The present case was tried

over a period of several days. The number of witnesses was large; the record is voluminous. The case was tried on the theory of multiple rather than single offenses. The jury was fairly instructed, and we will not disturb the verdicts approved by the trial court.

*Affirmed.*