**Richmond**

JOSEPH NATHANIEL BROWN, JR.

v.

COMMONWEALTH OF VIRGINIA

No. 0517-88-2

Decided March 27, 1990

COUNSEL

Craig S. Cooley, for appellant.

Thomas C. Daniel, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**DUFF, J.**—Joseph N. Brown was convicted by jury of conspiracy to distribute heroin. He was sentenced to ten years in prison and the payment of a fine of $20,000. On appeal he argues that (1) the evidence was insufficient to establish guilt beyond a reasonable doubt; (2) the trial judge erred by failing to grant his motions to strike; (3) the trial judge erred by refusing to grant his motion for a continuance; and (4) the trial judge erred in denying his motion for a change of venue. Upon review of the record and the authorities cited, we affirm the conviction.

I.

Joseph N. Brown was indicted in December, 1987 and charged with conspiracy to distribute heroin. The transactions which led to the indictment involved Brown, James E. Smith, and Gilbert Gray.

At trial, Gilbert Gray testified that he met Brown on April 15 and asked Brown to obtain heroin for him. Brown agreed to do so and Gray paid him $500, in advance, for the purchase. That same day, five calls were made to James Smith's pager from a pay telephone at the Oxon Hill Ramada Inn Hotel.[1] Having determined that defendant Brown's pager code was "00," the investigators learned that each of the five calls to Smith were from Brown. Detective Hampton of the Metropolitan Police observed Brown's vehicle, a maroon Mercedes, at the Ramada where the pay phone was located. Detective Hampton then observed Brown emerge from the hotel and proceed to the Sea Shell Restaurant. While Brown was in the Sea Shell Restaurant, Detective Neal, also of

---

[1] Early in the investigation it was discovered that Brown and Smith were coordinating their activities through the use of digital pagers. Investigators obtained two "clone" digital pagers set to the same frequency as those used by the defendant and Smith, allowing the investigators to monitor their activities.

the Metropolitan Police, observed Brown conversing with Gilbert Gray. While Brown was in the restaurant, the clone pager indicated that a pay phone inside the restaurant was used to call Smith's pager. Later that evening two more calls were made from code "00" to Smith's pager, one from the Ramada and one from the Sea Shell Restaurant.

Gray gave a statement to the Virginia State Police in which he said that when he met Brown again on April 16, Brown offered to pay him "for helping him move some things to Richmond." Brown then told Gray to "go ahead and he would catch up with me [Gray] or meet him at the Hardees right off Chamberlayne Avenue."

On April 16, the detectives followed a flurry of pager activity, verifying the information gained from the clone pagers through visual observation of the suspects at various telephones. The detectives observed Brown, driving Gray's Oldsmobile, following a blue Volvo belonging to Freda Brown, but driven by Gray. George Wright, a friend of Gray's, was a passenger in the front seat of the Volvo. James Smith then joined Brown in the front seat of the Oldsmobile and was observed reaching down toward the floor of the car. Shortly thereafter, Smith was seen walking rapidly toward the door of an apartment house.

Both the Oldsmobile and Freda Brown's Volvo were seen together again at the Wingate Apartments a short time later that day. Brown and Gray switched cars and Gray, now driving the Oldsmobile, headed out of town. According to the testimony of Wright, when he realized that Gray was leaving without him he requested that Brown catch Gray. Brown did so, and shortly after 2:00 p.m. the cars pulled into a gas station in Virginia, where Wright got in the car with Gray and Brown used a pay phone. The police verified, through visual observation and the clone, that Brown was again making a call to Smith's pager. A few minutes later, Brown answered Smith's return call on the pay phone, turned and conversed briefly with Wright and Gray, then left. The Oldsmobile, containing Wright and Gray, proceeded south on I-95, followed by Detective Hampton.

Gray and Wright stopped briefly at a drug store to get cigarettes, scotch tape and sinus medicine. The car was eventually stopped on I-95 in Hanover County where, upon search of the car,

two packets of heroin were discovered, one above the sun visor and the other under the front passenger seat. The two packets contained over 67 grams of heroin and quinine.

## II.

Counsel for the defendant contends that on February 22, 1988, prior to being retained, he appeared at a bond hearing on behalf of the defendant. At that time, counsel informed the trial court that he had not been retained and would not be trying the case unless he was retained.

Counsel ultimately was hired by the defendant on March 21, 1988, and a motion for discovery was filed on March 22. In response, the Commonwealth provided discovery on March 25. Defendant's counsel asserts that, by the evening of March 31, it was clear to him that a defense could not be fully prepared for trial on April 5 due to his inability to locate two out-of-state witnesses. A written motion for a continuance was filed on April 1, 1988. This motion was denied in a hearing held on April 4, 1988.

■ "The grant or denial of a continuance lies within the sound discretion of the trial judge." *Snurkowski v. Commonwealth*, 2 Va. App. 532, 535, 348 S.E.2d 1, 2 (1986). In this case, the April 5 trial date was set on February 22, 1988. At that time, defendant certainly knew that he would need to begin gathering his evidence and, if he so chose, employ legal counsel. The defendant delayed retaining counsel; as a result, the motion for a continuance was not filed until April 1, 1988. Under these circumstances, we find no abuse of discretion in denying a continuance.

## III.

■ When reviewing the sufficiency of evidence on appeal, the evidence will be viewed in the light most favorable to the Commonwealth, granting to it all inferences fairly deducible therefrom. *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). Proof of an explicit agreement to distribute a controlled substance is not required; the agreement may be proved by circumstantial evidence. *Wright v. Commonwealth*, 224 Va. 502, 505, 297 S.E.2d 711, 713 (1982). In fact, the nature of conspiracy is such that "it often may be established only by indirect and circumstantial evidence." *Floyd v. Commonwealth*,

219 Va. 575, 580, 249 S.E.2d 171, 174 (1978). With this in mind, it is clear that the Commonwealth proved, by circumstantial evidence, that a conspiracy existed.

■■■ "Conspiracy is defined as 'an agreement between two or more persons by some concerted action to commit an offense.' " *Cartwright v. Commonwealth*, 223 Va. 368, 372, 288 S.E.2d 491, 493 (1982) (quoting *Falden v. Commonwealth*, 167 Va. 542, 544, 189 S.E. 326, 327 (1937)); *see Amato v. Commonwealth*, 3 Va. App. 544, 551, 362 S.E.2d 4, 8 (1987). "[A] common purpose and plan may be inferred from a 'development and collocation of circumstances.' " *United States v. Godel*, 361 F.2d 21, 23 (4th Cir.), *cert. denied*, 385 U.S. 838 (1966) (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). Where, as here, it has been shown that the defendants "by their acts pursued the same object, one performing one part and the others performing another part so as to complete it or with a view to its attainment, the jury will be justified in concluding that they were engaged in a conspiracy to effect that object." *Amato v. Commonwealth*, 3 Va. App. 544, 552, 352 S.E.2d 4, 9 (1987) (quoting 16 Am. Jur. 2d *Conspiracy* § 42 (1979)). We find ample evidence in the record from which the jury could have found that Brown, Smith and Gray conspired to distribute heroin. The events of April 15 and 16, 1986, support the inference that Brown acted in concert with Smith and Gray to distribute heroin.

On April 15, Gray approached Brown and requested that he purchase drugs for him. At that time, Gray paid Brown $500, in advance, for the purchase. It is reasonable to infer from the evidence that Brown and Gray intended that Brown contact a third party to purchase the drugs. It also is reasonable to infer that the third party was Smith.

More than ten times on April 15 and 16, Brown's "00" code contacted Smith's pager. On most of those occasions, Brown was visually observed immediately thereafter receiving calls on a pay phone. Between 11:58 a.m. and 12:45 p.m., on April 16, Brown called Smith's pager three times. At 1:57 p.m. the same day, Smith was seen in the Oldsmobile with Brown, reaching down to the floor. When Brown met Gray at the Wingate Apartments (after meeting with Smith), Brown had a package. This package was in Gray's Oldsmobile when Wright later met Gray at the gas station outside Richmond.

As noted, Gray testified that Brown had asked him to move some "things" to Richmond for him, and that he would pay him to do so. While at the Wingate Apartments, and after having met with Smith, Brown instructed Gray to drive to Richmond, stating that he would meet him at a predetermined spot. Gray proceeded south on I-95 with the package beside him in the car.

The record also contains testimony by George Wright, the passenger in Gray's car, that Gray was aware of the contents of the package he was transporting for Brown. Wright stated that he discovered the contents of the package during his conversation with Gray on the trip to Richmond, and not by examination of the package itself.

It also is clear from the evidence that Gray believed that the heroin belonged to Brown and was not the "purchase" that he had requested of Brown. This inference is best illustrated by the fact that both Gray and Wright testified that they stopped along the way to pick up, among other things, scotch tape. The tape, it was explained at trial, was to be used to reseal the package of heroin in order to conceal the fact that Gray and Wright tore it open during the trip and "snorted" some of the heroin.

Based upon the evidence presented, we cannot say that the evidence was insufficient for a jury reasonably to have concluded that Brown joined with Smith and Gray in a conspiracy to distribute drugs, and that Gray was acting in furtherance of that conspiracy when he was apprehended in Hanover County. While Gray may not have been aware of the identity of Smith, this fact does not preclude him from participation in the conspiracy, for "[l]iability as a conspirator is not dependent on knowledge of the entire scope of the conspiracy. Knowledge need not extend to all the details of the conspiracy, the identity of the other conspirators." *Amato v. Commonwealth*, 3 Va. App. 544, 552, 352 S.E.2d 4, 9 (1987) (citations omitted).

## IV.

Brown next contends that Wharton's Rule requires that at least three people participate in a conspiracy to distribute heroin. However, Brown misapplies this principle. "Wharton's Rule" is defined as follows: "When to the idea of an offense plurality of agents is logically necessary, conspiracy, which assumes the volun-

tary accession of a person to a crime of such a character that it is aggravated by a plurality of agents, cannot be maintained." *Stewart v. Commonwealth*, 225 Va. 473, 478, 303 S.E.2d 877, 879 (1983) (quoting 2 F. Wharton, *Criminal Law* § 1604, at 1862 (12th ed. 1932)).

■ Wharton's Rule, therefore, will bar conviction for conspiracy to commit a criminal act where only those parties necessary to the commission of the underlying offense are involved in the conspiracy to commit that offense. The defendant maintains that in this case only those parties necessary to commit the crime of distribution were involved in the conspiracy. We disagree.

■ This case falls within the recognized "third party" exception to the rule. This exception permits prosecution for conspiracy where, as here, the number of conspirators exceeds the essential participants in the contemplated crime. *People v. Cabus*, 626 P.2d 1159, 1160 (Colo. Ct. App. 1980). We are not faced here with a simple buy-sell agreement. We are faced with a situation where a buyer, Gray, contacted a seller, Brown, with instructions to contact a third party (who would later prove to be Smith) to purchase heroin. This conspiracy goes beyond a mere buy-sell agreement. When Brown agreed to purchase the heroin for Gray, and received payment in advance, the conspiracy was complete. *See Brown v. Commonwealth*, 3 Va. App. 101, 107, 348 S.E.2d 408, 411 (1986). The inclusion of a third party where, at the most, only two parties were necessary, takes this case out of the scope of Wharton's Rule and firmly into the realm of conspiracy.

Further, Gray, at the direction of Brown and in anticipation of receiving payment, proceeded toward Richmond with full knowledge that he was transporting drugs. These actions do not evince a mere "buy-sell" arrangement between two parties.

We find ample evidence to support the conviction, and accordingly need not consider the additional contention that the trial court erred in refusing to grant the defendant's motions to strike the Commonwealth's evidence.

## V.

■ Finally, Brown asserts that Hanover County was improper venue for his trial. Under Code § 18.2-22, venue is proper in any

city or county where an act in furtherance of the conspiracy took place, as well as the place where the conspiracy was entered into. *Henry v. Commonwealth*, 2 Va. App. 194, 199, 342 S.E.2d 655, 657-58 (1986); *accord Hyde v. United States*, 225 U.S. 347 (1912); *United States v. Anderson*, 611 F.2d 504, 509 n.5 (4th Cir. 1979). Because conspiracy is a continuing offense, venue may be proper in more than one place. *Short v. United States*, 91 F.2d 614, 621 (4th Cir. 1937). "Each member of a conspiracy is responsible for the acts of others in furtherance of the conspiracy, and all conspirators, even those without knowledge of the particular act, may be tried where any of those acts are performed." *Henry*, 2 Va. App. at 198, 342 S.E.2d at 657.

Because Brown and Gray were engaged in a conspiracy to distribute drugs, and that conspiracy was ongoing at the time of Gray's arrest in Hanover County, venue was properly laid in that jurisdiction.

For the reasons stated herein, the defendant's conviction is

*Affirmed.*

Cole, J., concurred.

Benton, J., dissenting.

"Conspiracy is defined as 'an agreement between two or more persons by some concerted action to commit an offense.' " *Wright v. Commonwealth*, 224 Va. 502, 505, 297 S.E.2d 711, 713 (1982) (quoting *Falden v. Commonwealth*, 167 Va. 542, 544, 189 S.E. 326, 327 (1937)). "There can be no conspiracy without an agreement, and the Commonwealth must prove beyond a reasonable doubt that an agreement existed." *Floyd v. Commonwealth*, 219 Va. 575, 580, 249 S.E.2d 171, 174 (1978) (citations omitted). This record is devoid of sufficient evidence to establish that an agreement existed between James Smith and Joseph Brown with respect to the heroin that was seized in Gilbert Gray's automobile.

When the evidence is viewed in the light most favorable to the Commonwealth, as we are required to do following a conviction, *Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975), the evidence establishes that on April 15, the defendant, Joseph Brown, was seen at a motel in Maryland. A clone of James Smith's beeper was activated five times and

showed the telephone number of a public telephone at the motel. The police surveillance indicated that the calls were followed by the numbers "00," which is a code that the police attributed to the defendant, Joseph Brown. Shortly thereafter, Brown was observed entering a nearby restaurant where he took a seat with Gilbert Gray. Gray, who testified as a witness for the Commonwealth, stated that he contacted Brown directly and met with Brown at the restaurant because he was attempting to purchase heroin. Gray gave Brown $500 and asked Brown to buy heroin for him. During the time Brown was in the restaurant, the clone of Smith's beeper again was activated, with the return number being a public telephone in the restaurant, and with the code the officers attributed to Brown. Shortly thereafter, Brown left the restaurant and returned to the motel.

Gray testified that Brown had not obtained the heroin for him when, on April 16, Gray agreed to deliver a package to Richmond, Virginia for Brown. Gray left his home in Virginia on April 16 with his neighbor, George Wright, who went along "for a leisure ride." Gray testified that Brown called him at home and arranged to meet him in Maryland. Gray and Wright went to a location on Iverson Street in Maryland. After parking the car, Gray went to a building but got no response. Later, a blue Volvo driven by Brown joined them. Gray got in the Volvo. Wright then drove Gray's Oldsmobile to Washington, following Brown and Gray who were in the Volvo. When they arrived at a parking lot in Washington, Brown told Wright to get into the Volvo. Brown then drove off alone in Gray's Oldsmobile.

Brown was next seen by the police surveillance at a public telephone in front of a restaurant. The police noted a call on the clone of Smith's beeper showing the number of that public telephone followed by "00." After talking on the telephone, Brown entered the restaurant. Brown was seen emerging from the restaurant with a bag in his hand. After using the telephone again, he sat in the Oldsmobile.

After waiting a long while, Wright testified that he and Gray drove around the block and saw Brown sitting in the Oldsmobile. Gray and Wright then returned to the lot and waited. Brown returned to the lot, stayed a few seconds, and again left. Brown drove to another location. When the police next saw the Oldsmobile, Smith was sitting in the Oldsmobile with Brown. The police

officer who spotted the Oldsmobile testified that Smith was "seated in the passenger's side of the car, somewhat leaning down inside the car." Smith then left the Oldsmobile.

Ten minutes after Brown left Gray and Wright, Brown returned and asked Gray and Wright to follow him to the Wingate Apartments. At the Wingate Apartments, Gray left Wright in the Volvo, went to his Oldsmobile, and talked with Brown. At that time, Brown had a package; however, Gray testified that it was not the heroin he had sought to obtain. Brown "told [Gray] he would be able to get what [Gray] wanted, but he couldn't get it where he just came from and he had to go somewhere else to get it." Gray testified that on two occasions Brown went to places in an attempt to purchase heroin for him but was unsuccessful.

Gray agreed to deliver Brown's package to Virginia. Brown told Gray to "drive south" and stated that he was "going to get what you want." Brown told Gray, "I should be five or ten minutes behind you. I'll probably catch you on the highway, but if I don't catch you, meet me at the Hardees on Chamberlayne Avenue because I gotta go to Richmond anyway." Brown told Gray that he would take Wright home.

Gray drove off as soon as Brown got out of the Oldsmobile. According to Wright, Brown got in the Volvo and stated that he would take Wright home. Wright testified that he told Brown that he "was riding with [Gray] and I prefer him to drop me off." Brown then drove away and spotted Gray as he was crossing the bridge into Virginia. Both vehicles stopped at a service station. Wright got into Gray's Oldsmobile and the two of them proceeded toward Richmond. On the way to Richmond, Gray told Wright that he was transporting a package of heroin for Brown. As they drove south, Gray opened the package, which was under the armrest between the two front seats. He and Wright then used some of the heroin and later stopped at a drug store to buy tape to reseal the package.

On this evidence, the Commonwealth has failed to prove beyond a reasonable doubt that Smith agreed with Brown to commit an offense. Only by speculating is the majority able to conclude that Smith had any connection with Brown's scheme to transport heroin. "[S]uspicion is never enough to sustain a conviction." *Simmons v. Commonwealth*, 208 Va. 778, 783, 160 S.E.2d 569,

573 (1968).

Circumstantial evidence establishes Brown and Smith contacted each other through a series of beeper communications; however, that does not prove that Smith's relationship with Brown was based on narcotics. Contrary to the majority's assertion, there is no evidence (i) that Gray intended that Brown contact Smith to arrange a purchase of drugs or (ii) that Brown contacted Smith concerning a purchase of drugs. The majority speculates that, because Smith was seen on one occasion in the Oldsmobile "reaching down to the floor," he must have placed the heroin in the car. That speculation is untenable. Brown was observed leaving a restaurant with a bag. He went to the Oldsmobile with the bag and drove the Oldsmobile to an unknown location and at a time when he was not under observation. Smith was only seen in the Oldsmobile at a later occasion — after Brown entered the car with the bag.

The majority opinion states that Smith was seen "reaching down to the floor" and, apparently, assumes that this action was suggestive of criminal conduct. The record, however, belies this apparent inference. Smith was not seen carrying anything to the car. Moreover, Wright, who was in the Oldsmobile as it headed to Virginia, stated that the package of heroin was "sort of wrapped up in a bag at first." Wright said that when he got in the Oldsmobile the bag was located on the front seat "between the seat and the armrest." Wright testified that he could "see that bag without too much trouble." When the evidence shows that Brown was seen with a bag entering the unoccupied Oldsmobile and that the heroin was on the seat under an armrest when Gray left Washington, the inference that Smith brought the heroin to the car is simply untenable. If the package was found under the front seat when Gray was stopped by the police in Hanover County, it follows from the evidence that it was placed there by Gray or Wright after they pilfered from the package.

The evidence proves beyond a reasonable doubt that Brown asked Gray to transport the heroin from Washington to Richmond and that Gray did so. Brown gave the package to Gray in Washington for delivery to Richmond and Brown was to meet Gray in Richmond to accept delivery of the package. Each, therefore, on this evidence, participated in a distribution of heroin. The distribution statute proscribes the broad range of "delivery or

transfer, actual or constructive, of possession or title to such drugs *from one person to another." Wood v. Commonwealth*, 214 Va. 97, 99, 197 S.E.2d 200, 202 (1973) (emphasis added). However, I believe that Wharton's Rule prohibits a prosecution for conspiracy to distribute heroin when the evidence establishes that only two actors are involved in the agreement.

In reaffirming the validity of Wharton's Rule in Virginia, the Supreme Court observed:

> The doctrine has been stated as follows:
>
> When to the idea of an offense plurality of agents is logically necessary, conspiracy, which assumes the voluntary accession of a person to a crime of such a character that it is aggravated by a plurality of agents, cannot be maintained. The reason for the rule rests on the nature of the crime of conspiracy, which attempts to punish combination in crime which generates criminal activity " 'not confined to the substantive offense which is the immediate aim of the enterprise.' " The classic Wharton's Rule offenses - crimes such as adultery, incest, bigamy, duelling - "are characterized by the general congruence of the agreement and the completed substantive offense" and, therefore, indictment for conspiracy to commit such crimes is deemed to be unsound. A recent edition of Professor Wharton's text states, as an example of the Rule's application, that there can be no conspiracy between a prostitute and a panderer.
>
> * * * *
>
> Under the "third-party exception" to the Rule a conspiracy charge may be brought where the agreement which is the basis for the conspiracy involved more participants than were necessary for the commission of the substantive offense. The rationale supporting this exception is that the addition of a third party enhances the dangers presented by the crime and thus invokes the policy concerns addressed by the law of conspiracy.

*Stewart v. Commonwealth*, 225 Va. 473, 478-80, 303 S.E.2d 877, 879-80 (1983) (citations omitted).

Wright was not a party to the agreement to distribute the heroin. The record reflects that charges were dismissed as to him. The Commonwealth, in fact, proceeded under the theory that Smith was the third party participant to the conspiracy. Because the evidence failed to prove that Smith or any other third party participated in the transaction, I would reverse the conspiracy conviction and dismiss the indictment.