COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges Ortiz, Causey and Callins


TRAVIS LAMONT NOWELL

v.      Record No. 1990-24-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*]
PER CURIAM
FEBRUARY 10, 2026

FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
Sean C. Workowski, Judge

(Thomas M. Wilson, on brief), for appellant.

(Jason S. Miyares,[1] Attorney General; J. Brady Hess, Assistant
Attorney General, on brief), for appellee.


In a bench trial, Travis Lamont Nowell was convicted of delivering or conspiring to deliver

a controlled substance to a prisoner, in violation of Code § 18.2-474.1, and bribery of a public

official, in violation of § 18.2-447. On appeal, Nowell asserts that the trial court wrongly denied his

motion to strike, because the evidence was insufficient to prove either offense. Finding no error in

the trial court's judgment, we affirm.[2]

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] Having examined the briefs and record in this case, the panel unanimously agrees that
oral argument is unnecessary because "the dispositive issue or issues have been authoritatively
decided, and the appellant has not argued that the case law should be overturned, extended,
modified, or reversed." *See* Code § 17.1-403(ii)(b); Rule 5A:27(b).

BACKGROUND[3]

In 2022, Brianna Woods's husband was incarcerated at the Augusta Correctional Center.[4] Woods became friendly with Ashley Heckel, a corrections officer at the prison. Their communications ceased near the end of 2022 when Woods's husband was moved to another facility.

Several times during her husband's incarceration at the Augusta Correctional Center, Woods received in the mail a rubber balloon-like package that she then delivered to Heckel. Woods testified that the packages lacked "a proper return address. It would just be in [Woods's] mailbox and an envelope or a small box or it would have some random name on it." Woods made deliveries to Heckel "a handful of times" and sent payments to her Cash App account, all at her husband's directive.[5]

Heckel was fired from her job at the correctional facility and pleaded guilty to a felony for her role in bringing Suboxone strips to prisoners. Heckel testified that she participated in the scheme after Nowell had approached her twice and "propositioned [her] with a way to make more money by doing that." At the time, Heckel was having financial difficulties. In the first conversation Nowell "just hint[ed] around it, not really saying it, so I brushed it off."[6] Nowell

---

[3] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we discard any evidence that conflicts with the Commonwealth's evidence, and regard as true all the credible evidence favorable to the Commonwealth and all inferences that can be fairly drawn from that evidence. *Cady*, 300 Va. at 329.

[4] The record does not identify her husband.

[5] Woods testified that she pleaded guilty to "an offense" involving her dealings with Heckel. The record does not explicate the nature of her conviction.

[6] At trial, Heckel explained that prisoners often avoided speaking explicitly and instead would hint about what they meant.

discussed with Heckel her "bringing some strips in" to the facility. The second conversation occurred a week or two later, and she agreed to participate in the plan. They discussed the scheme in more detail, including payments to Heckel and "different ways to try to bring it in or [discussing] the front end security to try to figure out a way to get it in."[7]

From her experience as a correctional officer, Heckel knew that "when somebody said strips, you just knew that it was Suboxone strips." Heckel testified that the strips "just showed up. I, I didn't have any idea how to get them." About a day after his second conversation with Heckel, Nowell "brought in" another inmate named Norman (or "J-Baby") to coordinate the deliveries and discuss how Heckel would be paid. Heckel testified that she discussed the scheme with Nowell at least two times in the weeks before Woods made the initial delivery. Heckel made the deliveries between May and sometime in late 2022. Before her role in the distribution scheme was discovered, Heckel thought that more deliveries might be made.

Heckel received the strips from Woods and on various occasions provided them to Nowell, Norman, and a third prisoner named Collamore. None of them complained that they had received the wrong item. Heckel also received payments through a Damien (or "Utah"), whose name and phone number Nowell had given her. At Nowell's suggestion, Heckel set up a Cash App account and received payments totaling about $2,000 from Damien.

Damien Williams, who had been convicted for his role in the drug smuggling conspiracy, testified that he was confined at the Augusta Correctional Center from March 2009 to October 2014 and had been "in a relationship for the better part of that duration" with Nowell. They continued to communicate with each other after Williams's release in 2020. At Nowell's instigation, Williams set up a Cash App account that Nowell named Utah. Every time that Williams sent money through

---

[7] Heckel knew "quite a bit" about the security measures at the correctional center because she had worked at the front end and knew "how the scanners worked, . . . who worked up there, how they did their scanning and what they looked for and what they didn't look at."

the account it was at Nowell's direction. Williams did not know any of the people who received the payments and only learned that a corrections officer—Heckel—was one of the recipients when he filed a discovery motion in his own case. Williams testified that he did not ask Nowell for any details about the payments because he believed he could trust him based on their relationship. At some point Williams and Nowell discussed the money paid to Heckel, which amounted to three $500 payments. Nowell sent Williams a letter to let him know "at the end what all was going on." In the letter, Nowell said that Williams "might need you to pay the girl I choose to bring me the load."

Sean McDaniel, an assistant chief with the Office of Law Enforcement Services for the Department of Corrections, was qualified as an expert and testified regarding departmental drug investigations. Because he did not recover any drugs from Heckel, McDaniel investigated the case as a conspiracy. McDaniel stated that "strips," as prisoners used that term, referred to Buprenorphine Naloxone, more commonly known by the manufacturer's term as Suboxone strips. Buprenorphine Naloxone is a Schedule III controlled substance.

Kevin Collamore, the third prisoner mentioned in Heckel's testimony, had been Nowell's cellmate. The two had a conversation in which Nowell said that he was "bringing in strips" to the facility through a corrections officer. Collamore also heard Nowell tell J-Baby "that they had a play in there" to smuggle the contraband into the prison, which meant that "they had the situation worked out and that they were going to have stuff brought in."

After the Commonwealth rested, the defense moved to strike, which the trial court denied. Nowell rested without presenting any evidence. The trial court then convicted Nowell on both charges. After argument by the parties and Nowell's brief allocution, the court imposed concurrent six-year sentences on the two offenses and suspended two years and seven months. The court ordered the sentences to run consecutively with any other sentence.

ANALYSIS

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "The judgment of the trial court is presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "Thus, 'it is not for this [C]ourt to say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable doubt because as an original proposition it might have reached a different conclusion.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (alterations in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

Accordingly, an appellate court must review the evidence in the light most favorable to the Commonwealth, the prevailing party at trial, and accord it the benefit of all inferences reasonably drawn from the evidence. *Garrick*, 303 Va. at 182. "An appellate court may neither find facts nor draw inferences that favor the losing party that the factfinder did not. This remains so even when the factfinder *could* have found those facts or drawn those inferences" but chose not to do so. *Id*.

"Determining the credibility of witnesses . . . is within the exclusive province of the jury, which has the unique opportunity to observe the demeanor of the witnesses as they testify." *Dalton v. Commonwealth*, 64 Va. App. 512, 525-26 (2015) (alteration in original) (quoting *Lea v. Commonwealth*, 16 Va. App. 300, 304 (1993)). "The fact finder, who has the opportunity to see and hear the witnesses, has the *sole* responsibility to determine their credibility, the weight to be given their testimony, and the inferences to be drawn from proven facts." *Commonwealth v. McNeal*, 282 Va. 16, 22 (2011) (quoting *Taylor v. Commonwealth*, 256 Va. 514, 518 (1998)). An appellate court "will not seek to pass upon the credibility of the witnesses where their evidence is

not inherently incredible." *Gerald v. Commonwealth*, 295 Va. 469, 486-87 (2018) (quoting *Rogers v. Commonwealth*, 183 Va. 190, 201-02 (1944)).

> I. There was sufficient evidence for the factfinder to convict appellant on the charge of delivering or conspiring to deliver a controlled substance to a prisoner in violation of Code § 18.2-474.1.

"A conspiracy is 'an agreement between two or more persons by some concerted action to commit an offense.'" *Richard v. Commonwealth*, 72 Va. App. 598, 610 (2020) (quoting *Zuniga v. Commonwealth*, 7 Va. App. 523, 527 (1988)). "[D]efendants need not act in tandem while engaged in a conspiracy." *Carr v. Commonwealth*, 69 Va. App. 106, 118 (2018). Thus, if the evidence shows that two or more persons acted to pursue the same object, "one performing one part and the others performing another part so as to complete it or with a view to its attainment, the [trier of fact] will be justified in concluding that they were engaged in a conspiracy to effect that object." *Antle v. Commonwealth*, 83 Va. App. 485, 513 (2025) (quoting *Brown v. Commonwealth*, 10 Va. App. 73, 78 (1990)).

"A conspiratorial agreement 'often may only be established by circumstantial and indirect evidence including the overt actions of the parties.'" *Carr*, 69 Va. App. at 119 (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 636 (2011)); *see James v. Commonwealth*, 53 Va. App. 671, 678 (2009) ("It is a rare case where any 'formal agreement among alleged conspirators' can be established." (quoting *Wilder Enter. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1141 (4th Cir. 1980))). The Commonwealth does not have to prove an explicit agreement. *Speller v. Commonwealth*, 69 Va. App. 378, 389 (2018).

Nowell maintains that the evidence failed to prove that he conspired to deliver controlled substances to the Augusta Correctional Center. Nowell argues that the Commonwealth's evidence was "vague, ambiguous, and speculative," as reflected by such things as Williams's

initial ignorance of the purpose of the Cash App transactions and the lack of specificity in Collamore's account.

At most, these arguments raise factual issues that the trial judge, sitting as the trier of fact, reasonably resolved against Nowell. The evidence, viewed in the light mandated on appeal, amply established his guilt. Among other things, the fact that Nowell merely "hinted" to Heckel in their initial contact about smuggling drugs into the correctional facility was consistent with her testimony that prisoners often spoke obliquely. On its face, Heckel's testimony showed that she met with Nowell and Norman about the scheme and then on multiple occasions collected shipments from Woods, which she delivered to Nowell, Norman, and Collamore. Heckel and Williams's testimony showed that Nowell orchestrated payments to Heckel through a Cash App account by directing Williams to send her payments totaling "about" $2,000 for her role in the conspiracy. As for Williams's "initial" ignorance of the reasons why he was sending money to unknown persons, he testified that Nowell later admitted his purpose in asking Williams to open the Cash App account. He further testified that it was Nowell who told him to name the Cash App account "Utah." Furthermore, Collamore's claimed vagueness in describing details of the conspiracy and possible bias arising out of his own pending charges in the matter were credibility issues that the trial court reasonably resolved against Nowell. *See Dalton*, 64 Va. App. at 525-26. In short, any alleged gaps or uncertainties in the Commonwealth's evidence or impeachment of its witnesses were matters for the trier of fact to address. *See McNeal*, 282 Va. at 22. We have no basis for overturning its judgment.

II. There was sufficient evidence for the factfinder to convict appellant of the charge of bribery in violation of Code § 18.2-447(1).

Nowell challenges the sufficiency of the evidence on his bribery conviction on substantially similar grounds. We reject these arguments for substantially similar reasons.

Pursuant to Code § 18.2-447(1), when a person "offers [or] confers upon another (a) any pecuniary benefit[8] as consideration for or to obtain or influence the recipient's decision . . . or other exercise of discretion as a public servant[,]"[9] they are guilty of bribery. Nowell asserts that Heckel "never testified to receiving any explicit offer or direct monetary benefit" from Nowell personally. He similarly points to Williams's initial ignorance regarding the purpose of the Cash App account Nowell directed him to create. Additionally, he adds that Collamore's testimony "did not establish that [Nowell] explicitly offered any benefit or monetary inducement directly related to Heckel's official duties or responsibilities as required for bribery."[10]

Nowell's argument contravenes the fundamental principle that on appeal the evidence must be viewed in the light most favorable to the appellee, granting it all reasonable inferences drawn from the evidence. *Commonwealth v. Cady*, 300 Va. 325, 329 (2021). The record demonstrates that Nowell induced then-corrections officer Heckel to join a conspiracy to bring Suboxone strips, a Schedule III controlled substance, into the prison. In exchange for Heckel's participation in the scheme by circumventing prison security measures, Nowell directed payments to Heckel through a Cash App account. Nowell exploited Heckel's financial difficulties and her knowledge of the prison's security measures to persuade her to take corrupt

___

[8] Code § 18.2-446(3) defines "pecuniary benefit" as "a benefit in the form of money, property, commercial interest, or anything else the primary significance of which is economic gain."

[9] The term "public servant" includes "any officer or employee of this Commonwealth." Code § 18.2-446(4).

[10] In his motion to strike, Nowell argued that while there was evidence Heckel could receive extra money for her role in the conspiracy, "that's [not] really what the bribery statute is intended to address here." Supposedly, Heckel was "not like a real public official" to whom the bribery statute applied. On appeal, Nowell neither assigns as error any statutory construction issue nor argues anything other than the sufficiency of the evidence. Accordingly, he has waived any statutory construction issue under Rule 5A:20(c)(1), which states that only assignments of error listed in an opening brief will be noticed by this Court.

actions antithetical to her duties as a correctional officer. Heckel joined the conspiracy knowing that when Nowell approached her with the scheme she should have said "no and go[ne] to the investigators and [told] them what's going on." Thus, a reasonable trier of fact could find that Nowell bribed Heckel as part of his scheme to smuggle Suboxone strips into the correctional center.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*