COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges Huff, O'Brien and Fulton
Argued at Norfolk, Virginia


RASHAD DETWAN DOOLEY

                                                          MEMORANDUM OPINION[*] BY
v.        Record No. 0450-23-1                             JUDGE GLEN A. HUFF
                                                              JULY 23, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Michelle J. Atkins, Judge

G. Anthony Yancey for appellant.

Victoria Johnson, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Following a six-day trial in the Circuit Court for the City of Norfolk (the "trial court"), a

jury convicted Rashad Detwan Dooley ("appellant") of conspiracy to commit first-degree

murder, conspiracy to commit burglary, and attempted robbery.  Appellant appeals the two

conspiracy convictions, arguing that the trial court should have granted his motions to strike

because the Commonwealth's evidence was insufficient.[1]  Specifically, he asserts that the

evidence was insufficient for "a reasonable trier of fact" to conclude that the killing of the

decedent and the burglary of the decedent's residence "involved more than one person."  For the

following reasons, this Court affirms the trial court's judgment and appellant's conspiracy

convictions.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Appellant does not challenge his conviction for attempted robbery.

BACKGROUND[2]

In 2011, Christopher Cummings ("Cummings"), a student at Old Dominion University ("ODU"), shared a house located at 867 West 42nd Street in Norfolk, Virginia, with his fraternity brothers, including a student named Jack Carey ("Carey"). Cummings's bedroom was located on the second floor, directly above Carey's bedroom on the first floor. The house had three entrances on the first floor with the main entrance located near Carey's bedroom.

On May 17, 2011, Dylan Gingerich ("Gingerich"), one of Cummings's friends, was visiting the house when appellant and a man named Ahmad Watson ("Watson") arrived to purchase marijuana. Afterwards, Cummings asked them to shut and lock the front door on their way out. A few moments after their departure, Watson and appellant returned with a gun. Following a brief struggle, both men ran away. Cummings and Gingerich chased them on foot to no avail, after which Cummings reported the incident to the police. Gingerich identified one of the men as Watson, whom he had seen purchase marijuana from Cummings on previous occasions.

A few weeks later, Cummings and Carey were the only two people living in the house for the summer; Gingerich was spending the summer in Virginia Beach. On the night of June 9, 2011, Carey went out for the night and Cummings stayed home. During that evening, Gingerich received a phone call from Cummings, in which Cummings sounded "[v]ery panicked," "scared," and "out of breath." He told Gingerich that "the same person [as] before" just tried to rob him and that "[t]hey are going to be back. I need my boy out here." Gingerich refused

---

[2] On appeal, this Court recites the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, this Court "discard[s] the evidence of the accused in conflict with that of the Commonwealth, and regard[s] as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Cummings's plea, saying that he was already in bed because it was "10:30, 11:00" and he had work in the morning. He told Cummings to "call the cops."

Instead of calling the police, Cummings called Carey close to midnight and asked him to come home. Upon arriving, Carey saw a red car parked in the driveway with two individuals sitting inside, but Carey could not recognize the individuals in the dark. When Carey walked up to the front porch, Cummings and Watson were engaged in a "heated" argument. After Watson departed, Carey and Cummings went inside, and Cummings explained what had happened earlier that evening. He told Carey that he had been in his bedroom with some friends when one of Watson's friends pulled a gun on him, a struggle ensued, and Cummings told them to leave. Cummings was visibly upset and, to deescalate the situation, Carey invited him to join the party Carey had just left. Cummings refused, and Carey returned to the party alone.

Around 2:30 a.m. or 3:00 a.m. on the morning of June 10, 2011, Carey returned home and fell asleep. Sometime later, he was abruptly awoken by a loud bang, as if the front door of his house was kicked in. He heard "multiple people" enter the home and "multiple footsteps" ascend the stairs to the second floor. Moments later, Carey heard the door to Cummings's room being kicked in, followed by yelling and arguing, a physical struggle, and then a gunshot. The first gunshot was followed by another and then the sound of multiple individuals running down the stairs.

Carey remained in his room until he thought the intruders had left the house. He then grabbed a knife and slowly opened the door "maybe a couple of inches." When Carey opened the door, he saw a "tall black figure" wearing a white t-shirt run by his room towards the front door. Carey could not see the individual's face in the darkness. As he peered out of his door, he saw Cummings laying on the ground at the bottom of the stairwell.

- 3 -

As Carey crept into the hallway toward Cummings, he heard gunshots and blacked out. After regaining consciousness, Carey remained lying on the floor while listening for any sounds of movement. Hearing none, he staggered outside and tried to obtain assistance from a neighbor before he collapsed in the street. Another neighbor discovered Carey in the street and called 911 for aid.[3]

Yet another neighbor, Jason Baker ("Baker") testified that, while lying in bed, he heard one gunshot followed by four or five more. When he looked out the window, Baker saw an individual wearing a black shirt and jeans jumping off Cummings's porch. Baker testified that the individual ran down 42nd Street toward Colley Avenue. Baker then called 911. He subsequently saw Carey walk into the street and collapse.

Matthew Shaver ("Shaver"), a friend of Cummings and Carey, was walking past Cummings's house on his way to work during the early morning hours of June 10, 2011. As he walked by, he noticed the front door was ajar and saw a man run out of the house. Shaver testified that the man "locked eyes" with him and then ran down 42nd Street toward Colley Avenue. A few seconds later, Shaver heard gunshots from inside the house. He started running in the opposite direction and arrived at work by 4:48 a.m. Shaver testified that he was "80 or 90 percent" confident that the man he saw running away from Cummings's house was named Javon Doyle.

After several neighbors called 911, the police arrived at 847 42nd Avenue to find Cummings's body behind the front door of the home. Cummings was pronounced dead at the scene. His cause of death was a gunshot wound to the abdomen and another gunshot wound to the face. Additionally, Cummings had bruising to the back of the right hand, bruises on the left

---

[3] Although Carey survived his gunshot wounds, one bullet severed his left vocal cord and another passed through his hand and shoulder, ultimately requiring surgery and the insertion of a twelve-inch plate with screws.

- 4 -

side of his chest, a bruise at his right abdominal flank, and a bruise to his right knee. At trial, Dr. Gofton, an expert in the field of forensic pathology, testified that the abrasions and bruising on Cummings's body could be consistent with him being in a fight. Dr. Gofton also testified that there was stippling around the gunshot wound to Cummings's face, which indicated that the gun was discharged between one inch and possibly several feet away, depending on the ammunition used.

Investigation into Cummings's murder "went cold" for approximately a decade before Norfolk Police Investigator Jon Smith began working on the case in 2020. At that point, several key witnesses were finally willing to cooperate and testify. Significantly, during an interview on July 13, 2022, Gingerich identified appellant as the other of the two men involved in the May 17, 2011 incident. Additionally, preserved cell phone records[4] were analyzed with the assistance of the FBI and the police received new information from inmates Mustafah Muhammad ("Muhammad") and James Alexander ("Alexander") who had both served time in jail with appellant after 2011.

Muhammad and appellant were both incarcerated at the Newport News City Jail in 2015. Muhammad explained that he knew appellant as a youth "from the neighborhood" and had previously been incarcerated with appellant's father. When appellant asked about the circumstances of Muhammad's current incarceration, Muhammad admitted that he had been involved in a home invasion that resulted in a death. Appellant then confided to Muhammad that he had been a driver in a "lick"—a slang term for robbery—in Norfolk. Appellant provided some additional details about the robbery, including the fact that he and some other individuals had planned to meet up with "this dude" and then "shit got crazy."

_____

[4] Cell phone records had been obtained and maintained for phones associated with appellant, Watson, and Kwame Edwards, the latter bearing subscription information for Edwards's mother Shannon Edwards.

Appellant told Muhammad that the robbery did not go as planned and that "when we laid them down, dude jumped up, and the dude named Kwie shot him." He also mentioned the involvement of "Jay." Appellant insisted that he "didn't do shit" and was "just driving." Muhammad testified that he believed appellant had been seeking advice due to the similarity of their crimes. He informed appellant, however, that his role in the home invasion had only been as the driver but that "the driver is just as guilty as the shooter[,]" to which appellant replied "Damn, damn. I was just driving."

At trial, Muhammad testified that he knew a man called "Kwie" from the neighborhood who first name was Kwame. He also knew a man called "Jay" who used the moniker "Chipped Tooth Jay." Muhammad testified that he was cooperating in the case to give the victim's family some closure. He also acknowledged, however, that he was receiving a 16-year reduction of his federal sentence in exchange for his testimony against appellant. Nevertheless, he explained that this agreement could be revoked if he did not testify truthfully.[5]

The other jailhouse informant, Alexander, was incarcerated with appellant in the same housing section at the Chesapeake City Jail from March 8, 2022, through July 6, 2022. At that point, appellant had been arrested for his involvement in Cummings's murder. While working together—cleaning units, showers, and dormitories in the jail—Alexander and appellant became friendly, and appellant sometimes discussed the status of his case with Alexander.

During one such conversation, appellant referenced the fact that his case had been severed from his co-defendants' cases, meaning that he would be tried separately. He confided

---

[5] A previous statement Muhammad had made to a Newport News detective was also read to the jury, in which appellant had told Muhammad that "[t]hey was [sic] supposed to meet somebody to buy weed, and they met in a parking lot, and so they didn't want to do anything in the open. So, they went back to dude's spot. At the time, that's when they robbed him." When asked if appellant committed a robbery, Muhammad first said yes but then clarified that he did not know whether the robbery had been committed.

to Alexander that he was "glad they separated and gave us separate trials because now they can't place that gun in anybody's hand, and plus we was young as hell when we did that shit, and they just think that I'm the driver anyway."[6] At the time of his testimony, Alexander was awaiting sentencing in his own case. He acknowledged that a detective would attend his sentencing hearing and advocate for him in exchange for his testimony against appellant.

The Commonwealth also introduced cell phone records for Watson, Edwards, and appellant—including phone calls, text messages, and location information—that indicated the three men were either physically together or in remote communication with one another during various times throughout the evening of June 9, 2011, and morning of June 10, 2011. FBI Special Agent Wendell Cosenza testified as an expert in historical cell cite analysis, explaining that data from the phone records could be used to create a map of each phone's general location throughout the relevant time periods based on which cell towers recorded each phone's continual activity.

For example, 12 of the 18 calls made to and from Edwards's phone between 1:20 a.m. and 2:44 a.m. on June 10, 2011, were made to either appellant's phone or Watson's phone, during which time appellant's phone connected to a series of cell towers showing movement from the area around Newport News to the area at ODU where Cummings lived. Appellant's phone also travelled the same path earlier in the evening on June 9, 2011, as evidenced by its use

_____

[6] According to Alexander, he wrote a letter, dated Sunday, March 27, 2022, to the prosecutor in charge of his pending case in Norfolk, stating that he had information regarding Christopher Cummings's cold case in exchange for immunity and relocation to another state. The Norfolk prosecutor's office received the letter on March 30, 2022.

At appellant's trial, Alexander admitted to having read parts of a March 28, 2022 Virginian-Pilot newspaper article related to appellant's case, including issues of speedy trial and severance. He even gave a copy of the newspaper to appellant in jail. But he testified that he did not recall what was in the newspaper article in its entirety and that he only read it the day after he wrote his letter to the Norfolk prosecutor, "which lets you know I didn't get that information [about appellant] from the paper."

of a Newport News cell tower from 9:00 p.m. to 9:45 p.m. and then an ODU tower "643 feet from the crime scene" at both 10:52 p.m. and 11:04 p.m. The phone records also showed Watson's phone made the same trip from Newport News to the area of ODU near Cummings's residence "in the same general time frame" as appellant's phone.

The phone records further indicated a call between Watson's phone and appellant's phone at 3:27 a.m. in the City of Hampton, after which both phones stopped all activity until 5:47 a.m. According to Special Agent Cosenza, this was consistent with the phones being turned off and thus being off network. The lack of cell tower information for those approximately two-and-a-half hours, during which time the murder and burglary occurred, masked appellant's and Watson's whereabouts.[7]

Edwards, on the other hand, continued to use his phone during that period. His phone made or received a dozen calls between 4:18 a.m. and 4:36 a.m.—the approximate time of the murder and burglary—that connected through a cell tower only two blocks from Cummings's residence. Further activity, from 4:38 a.m. to 4:49 a.m., connected the phone to five different cell towers, showing movement from ODU back to Hampton. Special Agent Cosenza testified that both before and after the period of "radio silence," appellant, Watson, and Edwards exchanged dozens of calls and text messages among one another.

At the close of the Commonwealth's case-in-chief, appellant moved to strike the evidence for the two conspiracy charges, asserting that the "evidence as a whole has not proven a prima facie case that he committed a crime or that he helped somebody else commit a crime." In particular, appellant claimed that the evidence demonstrated the existence of only one shooter and did not place him at the scene of the crime. He also alleged that Muhammad's and Alexander's testimony

---

[7] Special Agent Cosenza testified, however, that appellant would have had sufficient time during those two-and-a-half hours to travel from the last recorded area in the City of Hampton to ODU and back again.

was not credible and that the cell phone records established an alibi because it showed that appellant was in the City of Hampton both before and after the shooting.

The trial court disagreed and denied the motion, ultimately sending the case to the jury for deliberation.[8] The jury returned a verdict convicting appellant of both conspiracy charges as well as attempted robbery. The trial court sentenced appellant to a total of 30 years' incarceration with 5 years suspended. This appeal followed.

STANDARD OF REVIEW

In ruling on a defendant's motion to strike, the trial court "should grant the motion only when it is conclusively apparent that [the Commonwealth] has proven no cause of action against defendant, or when it plainly appears that the trial court would be compelled to set aside any verdict found for the [Commonwealth] as being without evidence to support it." *Avent v. Commonwealth*, 279 Va. 175, 198-99-(2010) (alterations in original) (quoting *Banks v. Mario Indus.*, 274 Va. 438, 454-55 (2007)).

When reviewing a trial court's decision concerning the sufficiency of evidence, "the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it." *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *McGowan v. Commonwealth*, 296 Va. 450, 460 (2018) (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016)

---

[8] Appellant introduced some evidence, including testimony from an attorney who was an "expert in post-sentence reductions." At the end of trial, appellant renewed his motion to strike, which the trial court denied.

- 9 -

(quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

ANALYSIS

On appeal, appellant argues that the trial court erred in denying his motions to strike because the evidence was insufficient as a matter of law to support his convictions for conspiracy to commit murder and conspiracy to commit burglary.[9] He exclusively challenges the sufficiency of the evidence establishing his involvement in the shooting of Cummings and the burglary of Cummings's residence, claiming that "the evidence was insufficient to permit a reasonable trier of fact to conclude" that either crime "involved more than one person."[10] By alleging that no reliable evidence placed him at the scene of these crimes, appellant concludes that the record contains insufficient evidence of his involvement in a conspiracy to commit either burglary or murder. The commission of a crime, however, is not a required element for a charge of conspiracy to commit such crime. Accordingly, this Court refuses to reverse appellant's convictions for conspiracy on his

---

[9] Appellant's two assignments of error state as follows:

> I. The trial court erred in denying the Appellant's motion to strike the charge of conspiracy to commit first degree murder because the evidence was insufficient to permit a reasonable trier of fact to conclude that the killing of Christopher Cummings involved more than one person.

> II. The trial court erred in denying the Appellant's motion to strike the charge of conspiracy to commit burglary because the evidence was insufficient to permit a reasonable trier of fact to conclude that the burglary of Christopher Cummings'[s] residence involved more than one person.

[10] Although appellant addresses each conspiracy charge separately in his opening brief, the argument is the same for both assignments of error and both sections contain nearly identical language in support of that argument.

stated claim. *See Banks v. Commonwealth*, 67 Va. App. 273, 290 (2017) ("The appellant's sufficiency challenge fails because, insofar as the wording of his assignment of error is concerned, the dates alleged in the warrant have no bearing on whether the evidence was sufficient to establish the three elements of this offense.").

It is well-established in Virginia that the crime of conspiracy requires "(1) an agreement between two or more persons, which constitutes the act; and (2) an intent thereby to achieve a certain objective[,] either an unlawful act or a lawful act by unlawful means." *Charity v. Commonwealth*, 49 Va. App. 581, 586 (2007) (alteration in original) (quoting *Hix v. Commonwealth*, 270 Va. 335, 347 (2005)). Thus, unlike the proof required for an *attempted* crime, a *conspiracy* to commit a crime does not rely upon proof of any overt act or step taken in furtherance of the pre-planned crime. The Supreme Court has unequivocally held that "the crime of conspiracy is complete when the parties agree to commit an offense." *Id.* (quoting *Gray v. Commonwealth*, 260 Va. 675, 680 (2000)). And although "the Commonwealth must prove beyond a reasonable doubt that an agreement existed[,]" such conspiracy "may be proved by circumstantial evidence." *Floyd v. Commonwealth*, 219 Va. 575, 580 (1978).[11] "Indeed, from the very nature of the offense, it often may be established only by indirect and circumstantial evidence." *Id.*

_____

[11] "Circumstantial evidence is not 'viewed in isolation' because the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [fact finder]' to conclude beyond a reasonable doubt that a defendant is guilty." *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). "[T]here is no distinction in the law between the weight or value to be given to either direct or circumstantial evidence. The finder of fact is entitled to consider all the evidence, without distinction, in reaching its determination." *Muhammad*, 269 Va. at 479 (quoting *Commonwealth v. Hudson*, 265 Va. 505, 512-13 (2003)).

By questioning only the number of people involved in the murder and burglary, appellant does not raise a general sufficiency challenge to the evidence establishing a conspiracy.[12]  Our caselaw does not require that every single member to a conspiracy partake in carrying out the agreed-upon unlawful acts.  In fact, because "[n]o overt act in furtherance of the underlying crime is necessary" to prove a conspiracy, the underlying crime need never be completed at all in order to convict all parties to the agreement of conspiracy.  *Charity*, 49 Va. App. at 586 (quoting *Gray*, 260 Va. at 680).  Consequently, this limited issue that appellant raises does not present a legal ground for this Court to conclude that the trial court erred in denying the motions to strike and sending the case to the jury.

Furthermore, even if this Court could consider appellant's argument at face value, the record *does* present evidence of the involvement of more than one person in the murder and burglary.  In particular, the testimony given by Carey, Baker, and Shaver recounts facts from the night of the shooting which would be inconsistent with appellant's theory that only one person committed the crimes.  Carey explicitly stated that he heard "multiple people" with "multiple footsteps" enter the house he shared with Cummings.  After hearing gunshots from the floor above his bedroom, Carey then heard multiple individuals running back down the stairs.  He even had the opportunity to see one man run past his room wearing a white t-shirt.  But the man Baker saw jump off of Cummings's front porch following the gunshots was wearing a black shirt.  With just this testimony alone, a reasonable factfinder could conclude that at least two people were involved in the burglary and murder of Cummings.

---

[12] Although our courts have recognized that commission of the underlying crime can constitute circumstantial evidence of the pre-existing agreement, this principle does not support appellant's alternate contention that evidence of the agreement is rendered insufficient if less than all members of the conspiracy commit the intended acts.  Indeed, the jury rejected this hypothesis of innocence by finding appellant guilty of conspiracy despite Carey's inability to identify appellant as one of the men who broke into the house and shot both him and Cummings.

- 12 -

Moreover, Shaver testified that he saw a man, whom he believed was someone named Javon Doyle, running out and away from Cummings's house *before* he heard gunshots from inside the house. Based on the timeline of these testimonies, a reasonable factfinder could conclude that the person Shaver saw was a third member of the conspiracy. Indeed, such conclusion is further supported by appellant's own statements to fellow inmate Muhammad, which include his admissions that he and some other people had planned to rob Cummings, that "Jay" was involved, and that "the dude name Kwie shot [Cummings]."

"The sole responsibility to determine the credibility of witnesses, the weight to be given to their testimony, and the inferences to be drawn from proven facts lies with the fact finder." *Blankenship v. Commonwealth*, 71 Va. App. 608, 619 (2020) (quoting *Ragland v. Commonwealth*, 67 Va. App. 519, 529-30 (2017)). A reviewing court "must accept the '[fact finder's] determination of the credibility of witness testimony unless, "as a matter of law, the testimony is inherently incredible.""" *Hammer v. Commonwealth*, 74 Va. App. 225, 239 (2022) (quoting *Lambert v. Commonwealth*, 70 Va. App. 740, 759 (2019)). "Evidence is not 'incredible' unless it is 'so manifestly false that reasonable men ought not to believe it' or 'shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Gerald v. Commonwealth*, 295 Va. 469, 487 (2018) (quoting *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006)).

"A legal determination that a witness is inherently incredible is very different from the mere identification of inconsistencies in a witness' testimony or statements." *Kelley v. Commonwealth*, 69 Va. App. 617, 626 (2019). "Testimony may be contradictory or contain inconsistencies without rising to the level of being inherently incredible as a matter of law." *Id.* "Consequently, as Virginia law dictates, '[p]otential inconsistencies in testimony are resolved by

the fact finder,' not the appellate court." *Id.* (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 292 (2011)).

Here, the record does not establish the inherent incredibility of any of the Commonwealth's witnesses nor does appellant raise that specific allegation in his assignments of error. Therefore, appellant's argument presents no proper basis for reversal of his convictions. *See* Rule 5A:20(c)(i) ("Only assignments of error listed in the brief will be noticed by this Court."); *Dalton v. Commonwealth*, 64 Va. App. 512, 526 (2015).[13]

To the extent appellant's brief fleetingly mentions other ways in which the evidence was insufficient, this Court finds that such arguments are beyond the scope of appellant's narrow assignments of error and therefore precluded from consideration under Rule 5A:20(c)(i).[14] "[A]s an appellate court, we are limited to reviewing errors of the circuit court, as noted by the parties before this Court in their assignments of error." *Tatusko v. Commonwealth*, 79 Va. App. 721, 733 (2024) (quoting *Forbes v. Cantwell*, 78 Va. App. 454, 478 (2023)). This Court "cannot 'consider issues

---

[13] "When the law says that it is for the trier of fact to judge the credibility of a witness, the issue is not a matter of degree." *Dalton*, 64 Va. App. at 526 (quoting *Simpson v. Commonwealth*, 199 Va. 549, 557 (1957)). "So long as a witness deposes as to facts, which, if true, are sufficient to maintain their verdict, then the fact that the witness' credit is impeached by contrary statements affects only the witness' credibility . . . [and] the weight and sufficiency of the testimony." *Id.* "If the trier of the facts sees fit to base the verdict upon that testimony, there can be no relief in the appellate court." *Id.*; *see also Kelley*, 69 Va. App. at 626 ("'[T]here can be no relief' in this Court if a witness testifies to facts 'which, if true, are sufficient' to support the conviction '[i]f the trier of the facts' bases its decision 'upon that testimony.'" (quoting *Smith v. Commonwealth*, 56 Va. App. 711, 718-19 (2010))).

[14] After explaining why the evidence is insufficient to establish the involvement of more than one person in the shooting and burglary, appellant briefly asserts that "the Commonwealth's evidence does not show that the Appellant had any conversation about committing" either a murder or a burglary "with a co-defendant in his case." That challenge to the sufficiency of the evidence establishing the conspiracy—appellant's pre-existing agreement with at least one other person to commit murder and burglary—is not encompassed by the assignments of error. This Court, nevertheless, recognizes that the Commonwealth presented sufficient evidence on the question of appellant's participation in a conspiracy for the case to reach the jury. Nothing in the record demonstrates that the jury's verdict was plainly wrong or unsupported by the facts presented at trial.

touched upon by [appellant's] argument but not encompassed by his assignment of error.'" *Riddick v. Commonwealth*, 72 Va. App. 132, 146 (2020) (quoting *Banks*, 67 Va. App. at 290).[15] And "we cannot recast the assignment of error to allow [appellant] to make a different argument," even if such argument was previously made before the trial court. *Id.*

## CONCLUSION

For the foregoing reasons, this Court finds that the trial court did not err in denying appellant's motions to strike the evidence pertaining to his conspiracy charges. Appellant confines his insufficiency claim to the evidence establishing the number of people who committed the murder and burglary. But because appellant was charged with conspiracy to commit those crimes, rather than the actual commission of either murder or burglary, his assignments of error do not raise a cognizable claim in support of his prayer for relief or his criticism of the trial court's decision. Finding nothing in the record to justify reversal of the jury's verdict, this Court accordingly affirms appellant's convictions.

*Affirmed*.

---

[15] For example, in *Miles v. Commonwealth*, 78 Va. App. 73, 83 n.2 (2023), this Court refused to address appellant's claim "that the failure to instruct the jury on the meaning of 'unlawful' deprived him of due process" because his assignment of error on brief did "not allege a constitutional violation." Therefore, an appeal cannot be granted on an issue not properly raised and "appellant may not unilaterally add it as a new issue" merely by presenting it in the opening brief. *Thompson v. Commonwealth,* 27 Va. App. 620, 626 (1998) *see also Cruz v. Commonwealth*, 12 Va. App. 661, 664 n.1 (1991).